Gregory Lynn YANCEY, et
al., Plaintiffs,

v.

CARROLL COUNTY, KENTUCKY, et
al., Defendants.

Civ. A. No. 85–190.

United States District Court,
E.D. Kentucky
at Covington.

Dec. 1, 1987.

J.B. Rees, Gregory K. Berry and Raymond S. Bogucki, Florence, Ky., for plaintiffs.

Beverly R. Storm, Robinson, Arnzen, Parry & Wentz, Richard S. Nelson, Covington, Ky., James Crawford, Berry & Floyd, P.S.C., Carrollton, Ky., and William E. Johnson and J. Guthrie True, Frankfort, Ky., for defendants.

David Judy, pro se.

## OPINION

BERTELSMAN, District Judge.

This F.R.Civ.P.Rule 11 motion arises out of a 42 U.S.C. § 1983 action in which the plaintiff Yancey through his attorneys sought damages for alleged violations of his constitutional rights resulting from a claimed wrongful arrest and search. Yancey also asserted various state law claims. Plaintiffs Ashcraft and Cardwell asserted a claim for an alleged wrongful search arising out of the same circumstances.[1]

The entire scenario is bizarre in the extreme. The facts, highly summarized for the purposes of this motion, are as follows.

---

1. This claim was made in a separate action that was subsequently consolidated with this one.

## FACTS

On March 28, 1985, a double axe murder occurred in the City of Carrollton, Kentucky. Carrollton is a small town of 4,500 souls with a small-town police force. Therefore, the county sheriff and state police joined in the investigation.

On April 2 or 3, 1985, plaintiff Yancey boasted to his aunt, Faye Smith, that he had committed the murders and gave her many purported details of the murder scene and method. On April 5, 1985, Ms. Smith anonymously telephoned Detective Harrison at the Kentucky State Police headquarters and advised him of what her nephew had told her without revealing his name. Subsequently, Ms. Smith was induced to meet with the detective and give him a statement. Harrison and State Detective Hamilton went to the murder scene and checked out the informant's story. Some details checked and some did not.

On April 10, Detectives Harrison and Hamilton, after consulting with their supervisor, Lieutenant Davidson, met with defendant Ackman, the Commonwealth Attorney, and explained to him what evidence they had against Yancey. The Commonwealth Attorney then decided to seek an arrest warrant for Yancey. Also procured were search warrants for Yancey's apartment and the mobile home residence of his friends Ashcraft and Cardwell. Although the validity of these warrants was attacked by plaintiffs, the court has held that probable cause existed for procuring them and that proper procedures were followed. These rulings are now on appeal.

Yancey was arrested upon the issuance of the warrants. Hair and blood samples were taken from him but were found not to match any taken from the murder scene. Further investigation revealed many other discrepancies in the case against Yancey

such that the Commonwealth Attorney determined that he should be released for lack of evidence. He was released on April 15, 1985, after being held for five days.

Subsequently, the true murderer was apprehended, tried and convicted.

On August 13, 1985, Yancey, through his attorneys, filed the original complaint in this action. Named as defendants were Carroll County, City of Carrollton, the county sheriff, a deputy sheriff, the coroner, the Carrollton police chief, a Carrollton police captain, two Carrollton police officers, and Kentucky State Police (KSP) Detectives Harrison and Hamilton.[2]

On December 4, 1985, answers to interrogatories were filed by the defendants. One of the interrogatories asked for the names of "each person who conducted, assisted, or engaged in the investigation of the deaths of Ruby and Roy Bickers." In the response, 33 names were listed.

On January 10, 1986, Yancey filed an amended complaint[3] dropping all of the original defendants other than those named above, but adding 12 additional state police officers who had been listed in the answer to the interrogatories quoted above. Only one of these additional officers, Lieutenant Davidson, turned out upon further discovery to have been in any way involved in the decision to procure the arrest and search warrants. Some had only attended progress meetings during the investigation, others interviewed witnesses during the investigation or participated in the searches at the direction of their superiors. Defendant Heightchew had literally gone fishing at the time of the arrest and searches. Defendants Perry and Woods had been reassigned to non-related tasks. Defendant Marshall was merely a property custodian for evidence in the case. Defendant

2. Also named were numerous city officials in their official capacity, but their names were subsequently dropped as superfluous, it being sufficient to name the County and City.

3. Only Attorney Rees signed the amended complaint. The complaint in the separate action by plaintiffs Ashcraft and Caldwell, however, named the same defendants plus a couple of additional ones. Attorneys Berry and Bogucki,

who joined in the signing of the separate complaint, stated at the Rule 11 hearing that they concurred in the strategy of naming all these defendants. Efforts of defendants' attorneys in defending against the two actions are inextricably commingled. Therefore, there is no basis for the court to do other than consider all three plaintiffs' attorneys as equally responsible for both complaints.

**574**

Noble had only acted as photographer. Defendant Lusher was commander of the state police post to which many of the officers were assigned and was charged with failure to properly train the officers under his command. No evidence was ever offered as to what his training responsibilities, if any, were. Most training in the Kentucky State Police is done through the Academy in Frankfort.

In discharging this legal blunderbuss, plaintiffs' counsel relied solely on the interrogatory quoted above that had named these individuals as having "conducted, assisted, or engaged" in the murder investigation. No depositions were taken before filing the amended complaint to determine the nature of each officer's involvement. Extensive depositions, however, were taken following the filing of the amended complaint. Discovery concluded on July 22, 1986.

In due course, after discovery, most defendants filed motions for summary judgment that came on before the court for hearing on January 13, 1987. The hearing lasted several hours. At the hearing, the court required the plaintiffs to specify the evidence they had against each defendant.

Rulings of the court at the January 13, 1987 hearing were:

Defendant Ackman, the Commonwealth Attorney, was dismissed on the basis of prosecutorial immunity (Tr. 28). A libel claim against him remained but was subsequently dismissed on July 1, 1987. He has not filed a Rule 11 motion.

Motions for summary judgment of defendant state police officers Harrison, Hamilton, Davidson, Elliot, Simpson, and Lusher were taken under submission (Tr. 51 and 62). It was not until March 9, 1987, that the court dismissed these defendants on the ground that there was probable cause to seek the arrest and search warrants. Only officers Elliot and Lusher have filed Rule 11 motions.

Also at the January 13, 1987 hearing, plaintiffs voluntarily dismissed defendants

Noble, Woods, Heightchew, Marshall, Perry and Judy (Tr. 63). Officer Heightchew was fishing on the day of the arrest and search, Perry was in Harlan, Kentucky, and Woods was on the Northern Kentucky University campus that day. The other three officers were also only tangentially involved. Yet this motion for voluntary dismissal was not made until January 1987, well after their motions for summary judgment and memoranda in support were filed and well after the June 7 and July 22, 1986 depositions that illustrated their lack of involvement (Tr. 69). All six of the voluntarily dismissed officers filed Rule 11 motions.

In addition, the court granted the summary judgment motions of State Police Officers Moffett, Keith and Sharon (Tr. 56, 67–68), and the summary judgment motions of the Carroll County Sheriff Cayton and Deputy Sheriff Carter (Tr. 74) on the grounds of qualified immunity and lack of involvement. Officers Moffett, Sharon and Keith have filed Rule 11 motions.

Carrollton City Police Officers Stark, Booth, Ellis, Culver, Stamper and Jackson were also granted summary judgment at the January 13 hearing on the basis of qualified immunity and lack of involvement (Tr. 74–75). It was undisputed that the state police were in charge of the investigation and that the Carrollton City Police only followed orders. They had no part in developing the informant or in the decision to seek the warrants.[4] All of these city police officers filed Rule 11 motions.

As to defendants Simpson, Dunn, Carroll County, and the City of Carrollton, the court instructed the plaintiffs at the January 13 hearing to specify in the form of a letter after further reviewing the record of those legal theories upon which plaintiffs relied as to these defendants (Tr. 80, 81, 85). Plaintiffs submitted a letter to the court on January 22 that discussed their legal theories only as to defendant Simpson. Hence, Simpson's motion for

4. Plaintiffs' attorneys procured an expert's opinion to the effect that the Carroll County and Carrollton officials used improper procedures, but it is clear from reading the report that the expert was not advised of their minimal involvement.

summary judgment was taken under submission and was later granted on March 9. As to the other three defendants, the court presumed that plaintiffs entertained no plausible legal theories against them and, therefore, granted their motions for summary judgment on January 28, 1987. None of these defendants has filed Rule 11 motions.

A detailed chronology of events is set forth in the Appendix for further reference.

STANDARDS IMPOSED BY RULE 11[5]

Earlier this year, I had occasion to write at some length on the history of sanctions under Rule 11 and the policies and problems involved in the administration of that Rule. *See Whittington v. Ohio River Co.,* 115 F.R.D. 201 (E.D.Ky.1987). As I there observed, it is unknown at this time whether the benefits of Rule 11 outweigh its liabilities. In this case, for example, my staff and I have spent at least as much time on the Rule 11 motions as we did in dealing with the merits. Both efforts consumed a tremendous amount of time. At least three Circuit Courts of Appeals are now requiring extensive and specific findings of fact on Rule 11 motions. *Brown v. Federation of State Medical Boards,* 830 F.2d 1429 (7th Cir.1987), 44 Empl.Prac.Dec. (CCH) ¶ 37,398; *Thomas v. Capital Sec. Service, Inc.,* 812 F.2d 984 (5th Cir.1987); *Matter of Yagman,* 796 F.2d 1165 (9th Cir.1986). This is contrary to the expectations of the Advisory Committee that proceedings on Rule 11 motions would be of a summary nature. *See Whittington v. Ohio River Co.,* 115 F.R.D. at 206. It is fortunate that the Sixth Circuit has not yet required the meticulous exhaustive findings now required by the Seventh Circuit because, in my opinion, such a requirement is clearly contrary to the intent of the Advisory Committee. Surely a general outline of the trial court's reasoning such

as the one to which the reader is here being subjected should be sufficient. *But see Brown,* 830 F.2d at 1439. I would not be surprised if shortly the Rule 11 tail were wagging the substantive law dog in many cases.

At present, I have no way of knowing whether these Rule 11 proceedings will save the court time by deterring frivolous litigation. There is no way to determine how many spurious lawsuits are *not* filed because of Rule 11. At various seminars where I have spoken on the subject, I have asked for feedback from the lawyers present, and the resulting anecdotal evidence indicates that many are being more cautious in both accepting cases and in making pre-filing investigations. Therefore, my impression is that some frivolous litigation is being deterred by Rule 11, but it is impossible even to guess how much. An equally important and similarly unanswerable question, however, is how much meritorious litigation is also being chilled.[6]

The case at bar presents an excellent example of the problems inherent in Rule 11. From the testimony of plaintiffs' lead counsel, I am convinced that he acted in good faith. This young attorney had a client to represent who had been charged with heinous murders he did not commit. He was a pariah in his small community. Never mind that it now appears that this individual had brought this state of affairs on himself by bragging to his aunt about committing the murders. At the time, the attorneys believed that the aunt had concocted this story for the reward money and that the authorities had conspired falsely to arrest their client and then cover up the error when the necessary evidence was not forthcoming.

I find that plaintiffs' attorneys believed this in good faith at the time of filing the original complaint and that they had enough basis to justify the original filing,

---

**5.** The motions for sanctions are grounded on both F.R.Civ.P. 11 and 42 U.S.C. § 1988. Inasmuch as imposition of sanctions under § 1988 is discretionary with the court, the court has elected to merge the § 1988 inquiry with the Rule 11 inquiry, since Rule 11 does not require elements of bad faith, while § 1988 does. *Cf.*

*Smith v. Detroit Federation of Teachers,* 829 F.2d 1370 (6th Cir.1987).

**6.** *See Whittington, supra* at 210; *Eastway Construction Corp. v. City of New York,* 637 F.Supp. 558 (E.D.N.Y.1986).

including naming the county and city officials. Unfortunately, in an excess of zeal, the attorneys continued to maintain belief in their case even though overwhelming adverse evidence surfaced during the discovery phase. Further, their overzealousness led them to misinterpret the law, albeit in good faith, and to continue the action against many defendants who should have been dismissed.

Further, the attorneys by their own admission were unfamiliar with the additional obligations imposed on them by the amendment to Rule 11 in 1983. For these reasons, all more fully expounded below, the court has the distasteful obligation to impose sanctions in this case. I do this only with the greatest reluctance, in that these sanctions are imposed on young attorneys who acted in good faith and in the misguided belief that what they were doing was justified in the vigorous representation of their client. As I pointed out in *Whittington, supra,* however, and as has been pointed out by many others, under the new Rule 11 good faith is not a defense. Therefore, because I am constrained to find that the objective standards established by the new Rule were violated, sanctions are mandatory. *See Smith v. Detroit Federation of Teachers,* 829 F.2d 1370 (6th Cir.1987); *Albright v. Upjohn Company,* 788 F.2d 1217, 1222 (6th Cir.1986); *Whittington, supra,* 115 F.R.D. at 205 and cases cited therein. *Albright* is directly in point with the present case in that it holds that sanctions are mandatory where defendants are sued when a proper legal or factual basis for including them is lacking.

In *Whittington,* I attempted to spell out for attorneys their obligations under Rule 11, as derived from a synthesis of cases and articles interpreting it. That opinion summarizes Rule 11's requirements as follows:

"1. An attorney must READ every paper before signing it.

2. He must make a reasonable pre-filing investigation of the FACTS.

3. He must research the LAW, unless he is certain he knows it.

4. The law as applied to the facts must REASONABLY WARRANT the legal positions and steps he takes. If existing law does not warrant these positions, a plausible argument for the extension of the law to the facts of the case is required.

5. It must be demonstrated, as the basis of pre-filing investigation and research, that there is a REASONABLE BASIS to name each defendant named, and to support each claim asserted. *The shotgun complaint or answer, filed in the hope that discovery will produce the justification for it, is improper.*

6. The adequacy of an attorney's investigation, research and legal analysis will be evaluated by the court under an OBJECTIVE STANDARD, namely, whether the attorney acted as a reasonably competent attorney admitted to federal practice. Except as to improper purpose, subjective good faith is not a defense to Rule 11 sanctions. A pure heart but an empty head is of no avail.

7. The attorney must CONTINUALLY RE–EVALUATE his positions and abandon them if they are no longer reasonably warranted.

8. An attorney must not have an IMPROPER PURPOSE, such as harassment or intimidation, in naming any defendant, asserting any legal position or taking any legal step.

9. If an attorney violates Rule 11 the imposition of some sanction is MANDATORY, although the nature and extent of the sanction is discretionary with the district court."

*Whittington,* 115 F.R.D. at 209 (footnote omitted) (emphasis added). *Cf. Brown v. Federation of State Medical Boards,* 830 F.2d 1429, 1435 (7th Cir.1987).

## APPLICATION OF RULE 11 PRINCIPLES TO THIS CASE

There is no problem with the attorneys here reading every paper before signing. They made a reasonable investigation of the facts before filing the original complaint, considering the attendant pressures. Although the statute of limitations would not have run for almost a year, the attor-

neys needed to take a step to show that their client was fighting the stigma resulting from his arrest.

The amount of the attorneys' initial research of the law was more than adequate. The attorneys were relying on such language in the cases as: "Even nonsupervisory officers who are present at the scene of a violation of another's civil rights and who fail to stop the violation can be liable under section 1983. . . . [The defendant officer] was present while the other officers unlawfully searched the apartment and thereby violated the [the plaintiffs] rights." [7]

According to the plaintiffs' attorneys' testimony—which the court accepts—extensive investigation of newspapers at the time of filing the original complaint revealed that all of the defendants therein named were claiming a policy-making role in the murder investigation, a subject of intense local interest.

■ The attorneys, however, failed to make a sufficient factual investigation before filing the amended complaint. At the time of that filing, approximately four months remained before the statute of limitations would run. Persons who knew the facts were defendants in the action and subject to the deposition process. Plaintiffs' attorneys failed to depose them before casting the net of the amended complaint over all the officers who had been named in the interrogatory as being involved in any way in the investigation. The paramount teaching of Rule 11 is that "[t]he shotgun complaint or answer, filed in the hope that discovery will produce the justification for it, is improper." *Whittington, supra,* 115 F.R.D. at 207, n. 16. Here there was plenty of time to use the muscle of the federal discovery process prior to the statute running, but the opportunity was not utilized to validate the claims asserted in the amended complaint.

The attorneys further failed to fulfill their obligation under Rule 11 to reevaluate continually their positions and abandon them if they were no longer reasonably warranted. *See Thomas v. Capital Security Services, Inc.,* 812 F.2d 984, 988 (5th Cir.1987); *Golemi v. Creative Food Design, Ltd.,* 116 F.R.D. 73, 77 (D.D.C.1987); *Whittington, supra.* Here, when the depositions that should have been taken prior to the filing of the amended complaint were finally taken afterwards, the attorneys even then did not heed the incontrovertible facts reflected in these depositions. Particularly egregious was the failure to react to the unequivocal testimony of State Police Lieutenant Davidson, who was in charge of the murder investigation, that almost none of the officers added in the amended complaint, including all of the Carrollton police, had had any voice in making the decision to seek the arrest and search warrants. Excerpts from this deposition are set forth in the margin to give the reader the flavor of the Lieutenant's testimony.[8]   Although

---

7. *Smith v. Heath,* 691 F.2d 220, 225 (6th Cir. 1982) (citing *Bruner v. Dunaway,* 684 F.2d 422 (6th Cir.1982); *Putnam v. Gerloff,* 639 F.2d 415 (8th Cir.1981); *Smith v. Ross,* 482 F.2d 33 (6th Cir.1973); *Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972)).

8. The following excerpts are from the deposition of Lieutenant Dan Davidson, dated July 22, 1986:

Q.  Let's talk about Trooper Wayne Heightchew first.  Now, he would have been under your command would he not?

A.  Yes, sir.

Q.  Do you know generally what his involvement, if any, would have been in this homicide investigation that we're talking about here?

A.  I told him in October of 1985 to go up there and take Kevin Fitzgerald [the real murderer] from the Grant County Jail to Boone County, and as far as I know, that's all that I told him to do.

Q.  And that was after any arrests were made, whether it be Yancey or Fitzgerald or anything during the time period that this lawsuit is over; is that right?

A.  Yes, sir.

Q.  And I believe you were present approximately a month ago when Trooper Wayne Heightchew gave his deposition in this case, were you not?

A.  Yes.

Q.  And Trooper Heightchew testified that his only involvement in the case would have been as you related and he didn't have anything else to do with this case, basically?

A.  No, I still don't understand why he's in this.

(Davidson deposition, pp. 60–61)

Q.  Trooper C.G. Perry, do you have any independent recollection of what involvement, if

plaintiffs' attorneys had no evidence to contradict this testimony, they did not voluntarily dismiss all of the defendants not involved in the decision-making process but attempted to extract a settlement from them. Furthermore, plaintiffs' failure to dismiss those not involved required the defendants to expend the time and effort to prepare and file summary judgment motions.

No police defendants except Lieutenant Davidson, Sergeant Simpson, and officers Harrison and Hamilton were involved in the decision to seek the arrest and search warrants. It was they who decided to take the evidence to the Commonwealth Attorney and, after obtaining his approval, to the state district judges. The other defendants were in no way involved in these actions. This was totally clear from Lieutenant Davidson's deposition and from the other discovery depositions taken.

Even stretching to the limit plaintiffs' attorneys' interpretation of the cases on which they relied, the vast majority of the officers sued were in no way "present" at the pivotal event complained of: the decision to seek the warrants.

Moreover, it should have been clear to the attorneys for the plaintiff that, even were the degree of participation by these officers sufficient to justify an argument that they were sufficiently involved in the decision complained of, they were qualifiedly immune under the decision of the Supreme Court of the United States in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). That decision made clear that a police officer was entitled to the complete defense of qualified immunity unless "a reasonably well-trained officer in the petitioner's position would have known" that his actions violated the plaintiff's constitutional rights. At the completion of the discovery process it was clear that the officers who did not participate in the decision to obtain the warrant could not have known it was invalid, because they were not privy to the discussions with the Commonwealth Attorney or even aware of the facts that were presented to him. Therefore, applying an objective standard

any, that he had in the Bickers' homicide investigation?

A. Perry was not assigned to that case full time. He was not—I think the only assignment that was ever given to Perry was that I believe that the name of Clay Couch had come up and I just told Perry to go ahead and interview him and make a tape recording of it and give it to Hamilton, I think that's probably all Perry had to do with it.

Q. I believe he's previously testified that he did not have any involvement whatsoever in the arrest of Yancey or any alleged searches that took place on the 10th of April?

A. No, he's not one of them that we called to use on that day of the arrest.

Q. Detective Ken Woods, what is your recollection of his involvement in this homicide investigation?

A. I used Kenny because he was from Carrollton, he's a long time Carrollton native, he's a very experienced police officer, and I used him to help interview some of the people in town there that we figured that we might have a little difficulty in getting them to tell us a straight story and Kenny knew them pretty well, and I used him mostly for that. And I think he helped us in transporting some people up to Covington for a polygraph.

(Davidson deposition, pp. 62–63)

Q. Trooper Phillip Marshall, do you have an independent recollection of his involvement in this homicide investigation?

A. I think the only thing that I had Phillip do was meet us at Dry Ridge and help us on these searches and arrests there. I don't recall. I'd have to go back to my notes. I don't recall giving him anything specifically to do.

(Davidson deposition, pp. 65–66)

Q. With respect to Trooper Tony Moffett, do you recall what involvement, if any, Trooper Moffett had in the homicide investigation of the Bickers?

A. Before I became actively involved in the case, one of the supervisors had assigned Moffett and Sharon, I believe, to help Hamilton and Simpson. And Moffett did a lot of things. If you're asking what I remember that he did specifically, I had him checking the motels and hotels, for one thing, and I recall having him interview some people.

(Davidson deposition, p. 67)

Q. I want to add to those seven people the name of David Judy, what involvement did David Judy have with all this?

A. David Judy made the mistake of coming in there and getting him a cup of coffee one morning, that's about the size of it. David Judy didn't have anything to do with it. Of course, we're not going to run him off if he wants to come in there and listen, you know, but all he did was come in there and get a cup of coffee.

(Davidson deposition, pp. 70–71)

Testimony concerning other defendants was in a similar vein.

—namely, whether the plaintiffs' attorneys acted as reasonably competent attorneys admitted to federal practice—there was no reasonable basis to retain in the action most of the defendants that had been named in the amended complaint.

A further violation of this objective standard occurred in that the attorneys did not keep current with the stricter obligations imposed on them by the 1983 amendment to Rule 11. *Albright, supra,* was decided by the Sixth Circuit on April 24, 1986, approximately 90 days prior to the deposition of Lieutenant Davidson, which concluded discovery in this case. Its import should have been appreciated by these attorneys at that time.

For these reasons, the court must hold that, although plaintiffs' attorneys acted in good faith, this is not a defense. The objective standard established by Rule 11 was violated, and sanctions must be imposed.

## THE SANCTIONS TO BE IMPOSED

Because the court has found that Rule 11 has been violated in this case, the imposition of some sanction is mandatory, but the nature and amount of sanctions is to be determined in the sound discretion of the court. *Brown v. Federation of State Medical Boards,* 830 F.2d 1429 (7th Cir. 1987); *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1538 (9th Cir.1986); *Albright v. Upjohn Company,* 788 F.2d 1217, 1222 (6th Cir.1986); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 n. 7 (2nd Cir.1985); *Bastien v. R. Rowland & Co.,* 116 F.R.D. 619, 621 (E.D.Mo.1987); *Whittington v. Ohio River Co.,* 115 F.R.D. 201, 208 (E.D. Ky.1987).

█ There are mitigating circumstances. Although the plaintiffs' attorneys violated the objective standard of Rule 11, they acted in good faith out of an excess of zeal for their client. Although the attorneys should have been aware of the increased obligations imposed by the 1983 amendment to Rule 11, they were not, and hence

find themselves in this present predicament primarily because of ignorance. Certainly, they were not alone in July of 1986 in their failure to appreciate the implications of amended Rule 11.

These attorneys followed the outmoded practice of shotgunning a complaint aimed at numerous defendants in the hope that something would turn up to hold them in, or at least that a settlement could be extracted as a price for letting them out. This practice, I regret to note, is still all too common. Attorneys must learn that it is now forbidden by Rule 11 and that they must eliminate it from their repertoire of litigation strategies.

On the other hand, although mitigating circumstances exist, the Rule 11 violations in this case caused substantial expense, inconvenience and aggravation to several officers and governmental entities who should never have been brought into this litigation or who were entitled to have been dismissed no later than July 22, 1986, when discovery ended with the deposition of Lieutenant Davidson referred to above.

In the exercise of its discretion, as conferred by Rule 11 and the authorities interpreting it, the court believes the conflicting equities are best balanced by awarding sanctions for attorney's fees and expenses incurred by the movants only after August 1, 1986, shortly after the completion of discovery, and in an amount calculated at a rate substantially more modest than that claimed by most movants.

Sanctions are hereby awarded against the attorneys, Rees, Berry, and Bogucki in the amount of the legal expenses incurred by the defendants Stark, Culver, Booth, Ellis, Stamper, Jackson, Judy, Keith, Heightchew, Perry, Woods, Marshall, Noble, Moffett, Sharon, Lusher, and Elliot after August 1, 1986. These sanctions shall be computed at the rate authorized for federal public defenders, $40 per hour out-of-court time and $60 per hour in-court time. Each respondent attorney shall pay one-third of the amount.[9] The liability shall be several, not joint. The court uses

---

9. Although Rees was clearly more responsible for the decisions made, at the Rule 11 hearing the attorneys assumed equal responsibility for purposes of the motion.

this date because it believes that August 1, 1986 is the very latest date when it was clear these defendants should have been voluntarily dismissed. The reason for this lenient method of computation is to recognize the mitigating circumstances mentioned above. In effect, the court is excusing the inadequate investigation prior to filing the amended complaint because of the mitigating circumstances.

The court believes that this method will properly give effect to the three goals of Rule 11: compensation to defendants, cost shifting and equitable considerations. *See Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1437–38 (7th Cir. 1987).

The defendants' attorneys shall recompute their motions for the amounts due under this formula and submit revised applications not later than 15 days herefrom. The plaintiffs may object to the computation not later than a further 15 days therefrom, which objections, if any, will be referred to a Magistrate.

The court wishes to emphasize again that it finds that the plaintiffs' attorneys acted in good faith but in an excess of zeal. The court does not construe the Rule 11 violation herein as an ethical violation and does not believe that any disciplinary proceedings before the Bar Association would be appropriate. Rule 11 imposes an entirely different standard of fault than bad faith or malicious intent. Its purpose is in part a cost-shifting one, to impose unwarranted legal expenses on those who caused the expenses. *See Whittington, supra* at 206–7 and authorities therein cited; *Brown*, 830 F.2d at 1437–38.

As a final personal observation, it is my utmost wish that all attorneys will become familiar with Rule 11 and start observing it, so that opinions like this, which are distasteful to all concerned, will be unnecessary in the future.

## APPENDIX

| | |
|---|---|
| March 28, 1985 | Ruby and Roy Bickers are murdered. Yancey boasts to aunt that he is the murderer. |
| April 5, 1985 | Detective Harrison receives call from informant. |
| April 10, 1985 | Yancey is arrested. |
| April 15, 1985 | Yancey is released from custody for lack of evidence. |
| August 13, 1985 | Yancey files complaint alleging § 1983 violations. |
| December 4, 1985 | Interrogatories propounded by plaintiff are answered by defendants Stark, Culver, Booth and Ellis. |
| January 10, 1986 | Yancey files amended complaint. |
| March 5, 1986 | Supreme Court of United States decides *Malley v. Briggs*, 106 S.Ct. 1092. |
| March 16, 1986 | Deposition of plaintiff Yancey. |
| April 9, 1986 | Complaint of plaintiffs Ashcraft and Cardwell is filed. |
| April 24, 1986 | Decision of United States Court of Appeals for the Sixth Circuit in *Albright v. Upjohn Company*, 788 F.2d 1217. |
| April & November 1986 | Plaintiffs' expert, Dr. Anderson, gives his opinions regarding the performance of the Kentucky State Police Department and the Carroll County Police Department. |
| June 18, 1986 | Plaintiffs make a demand for settlement of $135,000. |
| July 22, 1986 | Deposition of Kentucky State Police Lieutenant Davidson. Discovery concluded. |
| January 13, 1987 | Hearing on summary judgment motions. |
| January 15, 1987 | Order entered concerning January 13, 1987 hearing granting summary judgment motions of Keith, Noble, Woods, Perry, Heightchew, Marshall, Judy, Moffett, Sharon, Carter, Stark, Booth, Ellis, Culver, Stamper and Jackson. |
| January 28, 1987 | Summary judgment motions of Dunn, Carroll County, and City of Carrollton granted. |
| March 9, 1987 | Summary judgment motions of Simpson, Harrison, Hamilton, Lusher, Davidson and Elliott granted. |
| July 1, 1987 | Judgment dismissing last count against Ackman entered, making all judgments appealable. |