Raul FELICIANO, Jr., and Valeria Greathouse (92–3015/3096), Plaintiffs–Appellants,

Richard Rojas; Robert S. Beavers; Richard Zappala; and Darryl T. Hood (92–3096), Plaintiffs–Appellants,

v.

CITY OF CLEVELAND, et al., Defendants–Appellees.

Nos. 92–3015, 92–3096.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1993.

Decided March 16, 1993.

---

650

Edward A. Icove (argued and briefed), Edward A. Icove, Lustig, Icove & Lustig, Harold L. Williams (briefed), Legal Aid Soc. of Cleveland, Cleveland, OH, for plaintiffs-appellants.

Barbara R. Marburger, Asst. Director of Law (argued and briefed), City of Cleveland Law Dept., Cleveland, OH, for defendants-appellees.

Before: KENNEDY and GUY, Circuit Judges; and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Plaintiffs, a group of former cadets in the City of Cleveland's ("City") police academy, appeal from the district court's grant of summary judgment against them in this action under 42 U.S.C. § 1983 (1988). The plaintiffs contend that the City violated their Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures and that the City and several Cleveland police officers and employees violated their Fourteenth Amendment right to substantive due process when the defendants subjected the plaintiffs to a surprise drug test while they were cadets at the City's police academy. The plaintiffs tested positive for marijuana use and were forced to resign. The district court granted summary judgment for the defendants on all claims. For the reasons stated below, we AFFIRM the judgment of the district court.

I

In October, 1985, William Hanton, who was then the Chief of Police of Cleveland, received a tip that some unnamed cadets in the Cleveland police academy were using controlled substances, so he decided to administer a drug test to the entire class. Hanton looked for a laboratory to perform the test and decided to use SmithKline Bio-Science Laboratories in Beachwood, Ohio. On the morning of October 21, 1985, during the cadets' final week of training, the male cadets were told to go to the men's rest room and the female cadets were told to go to the women's rest room where they were given containers marked with their names and badge numbers. They were then told to urinate into the containers.

Because all of the cadets were being required to give their samples at the same time, some of the plaintiffs were forced to produce their samples while standing in the middle of the rest room while their superior officers watched. One plaintiff, Robert Beavers, wanted to wait and produce his sample in a stall, but a police officer told him to urinate while standing in front of the officer. When Beavers objected, the officer told him that he would be terminated unless he urinated within the officer's view immediately. J.A. at 339. During the test, the police officers collecting the samples allegedly made remarks such as "[w]e want to see what you have been doing this weekend" and "[e]verybody pees." J.A. at 235.

The urine samples were sent to SmithKline where they were screened for commonly abused drugs, including marijuana and cocaine. The laboratory tested each sample with the enzyme immunoassay test and the thin layer chromatogram test. Samples that tested positive for the presence of marijuana were re-tested with the radioactive immunoassay test to confirm the result. The samples provided by the plaintiffs tested positive for marijuana. The laboratory re-tested the plaintiffs' samples the next day using the same tests, and the samples again tested positive.[1]

After Chief Hanton received the results of the drug test, he passed the information to Reginald Turner, the Public Safety Director, and recommended that Turner terminate the plaintiffs. J.A. at 181. On October 22, 1985, the plaintiffs met individually with a panel of three officers. The officers told them that the drug test revealed traces of marijuana in their urine. When given the opportunity to explain the presence of marijuana in their urine, some of the plaintiffs claimed that they had not smoked any marijuana themselves, but that they were exposed to marijuana smoke at parties the weekend before they were tested. Other plaintiffs admitted that they had smoked marijuana in the past but claimed that they had not smoked it recently. The

---

1. As part of an internal quality control measure, the samples with sufficient volume were later re-tested by SmithKline using a gas chromatography/mass spectrometry test, which is more expensive and more reliable than the other three tests, to re-confirm the positive results after the plaintiffs had been forced to resign. J.A. at 207. The specimens from the plaintiffs who chose to give a second sample were also part of this internal quality control measure.

panel of officers informed all of the plaintiffs that they could resign or submit a second urine sample and face probable termination by Safety Director Turner the next day.

After roll call on October 23, 1985, the plaintiffs were separated from the rest of the class. They were informed that Safety Director Turner had decided to fire them because they had violated their probationary period by smoking marijuana. However, they were told that they could resign instead of being fired. Given this choice, the plaintiffs all agreed to resign instead of waiting for termination. A police officer handed them previously prepared letters of resignation, and the plaintiffs signed them.

On November 13, 1985, two of the cadets, Richard Rojas and Raul Feliciano, filed a complaint in federal district court alleging that the City had a policy of conducting drug testing without standards or procedures. This policy, they alleged, caused violations of their rights under the Fourth, Fifth, and Fourteenth Amendments. The plaintiffs also alleged that their constitutional rights had been violated by several individual defendants. On October 17, 1986, Valeria Greathouse, Robert Beavers, Richard Zappala, and Darryl Hood, four more of the cadets who tested positive for marijuana use, filed a complaint in district court containing similar allegations. The two actions were consolidated. Named in the complaints as defendants are former Public Safety Director Turner, former Chief of Police Hanton, several police officers, several employees of the City, and the City itself.

On January 22, 1986, the individual defendants in their individual capacities filed a motion for summary judgment on the plaintiffs' claims on the ground of qualified immunity directed to the first action.[2] While this motion was pending, the City also filed a motion for summary judgment. In a marginal order dated April 11, 1986, the district court denied the individual defendants' motion for summary judgment.

Following a timely appeal, this court, in an unpublished opinion dated April 10, 1987, reversed the district court and ordered it to grant summary judgment for the individual defendants on the Fourth and Fourteenth Amendment issue on the ground of qualified immunity. J.A. at 278. The Fourth, Fifth, and Fourteenth Amendment claims against the City remained as did the Fourteenth Amendment claims against the individual defendants in their individual capacities.

The plaintiffs then moved for summary judgment on their Fourth and Fourteenth Amendment claim against the City. In *Feliciano v. City of Cleveland*, 661 F.Supp. 578 (N.D.Ohio 1987) (*"Feliciano I"*), the district court granted the plaintiffs' motion for summary judgment against the City and, pursuant to this court's prior unpublished opinion, granted summary judgment for the individual defendants on the Fourth and Fourteenth Amendment claim on the ground of qualified immunity. The Fourteenth Amendment claims against the City and the individual defendants in their individual capacities still remained. On December 14, 1989, however, in light of two Supreme Court decisions handed down after *Feliciano I* was decided, the district court vacated *Feliciano I* in an unpublished order.

After the district court vacated *Feliciano I*, the parties moved for summary judgment on all counts. On November 26, 1991, the district court granted summary judgment for the defendants on all counts. The court held that the drug testing was an unreasonable search because there were no regulations governing the manner in which the urinalysis was conducted. Applying the test established by the Supreme Court in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), it held that the manner in which the test was conducted was unduly intrusive and oppressive. However, it concluded that the City was not liable for damages under the Fourth

---

**2.** This motion for summary judgment was, without objection, treated by the district court as directed toward both complaints.

and Fourteenth Amendments because a final policymaker for the City had not instituted the drug test, and therefore, the City itself had not committed the constitutional tort. The court again, consistent with the unpublished opinion of this court, granted summary judgment for the individual defendants on the Fourth and Fourteenth Amendment claim on the ground of qualified immunity. Turning to the plaintiffs' Fourteenth Amendment claims, the court concluded that the plaintiffs had not been denied their rights to equal protection or procedural or substantive due process. The district court accordingly granted summary judgment for the defendants as to these claims. The plaintiffs then perfected this timely appeal to this court contending only that the district court erred in finding that the City was not liable on the Fourth and Fourteenth Amendment claim and that neither the City nor the individual defendants were liable under the substantive due process component of the Fourteenth Amendment.

## II

■ This court reviews the grant of summary judgment *de novo*. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir.1990). "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* If a reasonable jury could not find that the nonmoving party is entitled to a verdict then there is no genuine issue for trial and summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III

### A

We turn first to the question of the City's liability.[3] The plaintiffs contend that

the district court erred when it found that the City is not liable for damages. They argue that the Chief of Police has the authority to make final policy for the City on drug testing of police; therefore, they contend, the City is liable for his decision to drug test the plaintiffs without proper regulations. Alternatively, the plaintiffs contend that even if Chief Hanton did not have the authority to make final policy regarding drug testing, a final policymaker for the City ratified Chief Hanton's decision.

■ In several decisions, the Supreme Court has begun to define the contours of municipal liability under § 1983. In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), the Court held that municipalities and other local government units are "included among those persons to whom § 1983 applies." Local governments may therefore be properly sued for "monetary, declaratory, or injunctive relief" when they commit a constitutional tort. *Id.*

■ However, a local government is liable as an entity only when the government itself has committed the constitutional violation, not when the violation was committed by its employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478–79, 106 S.Ct. 1292, 1297–98, 89 L.Ed.2d 452 (1985). As the *Monell* Court stated:

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. The principle of *respondeat superior*, therefore, is inapplicable to § 1983 actions because § 1983 extends liability only to persons who "cause" constitutional violations, and municipalities do not "cause"

---

**3.** The only question that we address with respect to the Fourth and Fourteenth Amendment issue is whether the City is responsible under § 1983 for the alleged Fourth and Fourteenth Amendment violation. Since we determine that the City is not responsible for the conduct of

Chief Hanton and his subordinates and that Safety Director Turner did not authorize or ratify such conduct, we need not address the question of whether any of these individuals committed such a violation.

constitutional violations solely by having employed a constitutional tortfeasor. *Id.* at 691–92, 98 S.Ct. at 2036.

■■■ In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1985), the Supreme Court held that a municipality can be held liable under § 1983 for a single decision by the municipality's policymakers. *Id.* at 479–80, 106 S.Ct. at 1298. However, the municipality is liable for an official's unconstitutional action only when the official is the one who has the "final authority to establish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct. at 1299 (plurality opinion). Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion). Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority. *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion).

■■■ To determine whether final authority to make municipal policy is vested in a particular official, we must resort to state law. *Praprotnik*, 485 U.S. at 125, 108 S.Ct. at 925 (plurality opinion); *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir.1989). This includes "state and local positive law," such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and

custom. *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723; *Mandel*, 888 F.2d at 793.

Turning now to the case at bar, it is undisputed that the Chief of Police ordered the drug test of the plaintiffs. Therefore, the City *can* be liable if: 1) Chief Hanton had the authority under applicable state law to make final policy regarding drug testing of police; or 2) a final policymaker for the City ratified Chief Hanton's actions. We shall first determine whether state law vested Chief Hanton with final policymaking authority, then we shall turn to the ratification question.

**B**

■■■ The applicable Ohio law, that is, the City Charter of Cleveland[4] and section 135.09(a) of the Cleveland Code,[5] reveals that the Chief of Police is subordinate to the Director of Public Safety. Cleveland, Ohio, Code § 135.09(a) (1988). The plaintiffs offer no regulations or written procedures that indicate otherwise. Thus, plaintiffs have not shown that the Chief of Police has been delegated the authority to make final policy regarding drug testing through Ohio positive law.

■■■ This does not end our inquiry, for we must also look at Ohio procedure and custom. *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723. For purposes of § 1983, a "custom" is a legal institution that is permanent and established, but is not authorized by written law. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. Before a custom can be the basis for a civil rights violation, the custom must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.*

To support their contention that it was the custom in Cleveland for chiefs of police to make final policy regarding drug test-

---

**4.** The Cleveland Charter provides:
  The Chief of Police shall have exclusive control of the stationing and transfer of patrolmen and other officers and employees constituting the Police Force, under such rules and regulations as may be established by the Mayor or by the director of the department to whom the Chief of Police may be immediately responsible.
  Cleveland, Ohio Charter § 116 (1951).

**5.** Section 135.09(a) provides in relevant part: "There is established a Division of Police in the Department of Public Safety, to be administered and controlled by a Chief of Police, subject to the provisions of the Charter and ordinances of the City, and to the direction of the Director of Public Safety." Cleveland, Ohio Code § 135.-09(a) (1988).

ing, the plaintiffs offer several "General Police Orders" that deal with drug testing and substance abuse issued by Chief Hanton, his successors and his predecessors. One of these General Police Orders, which was issued by Chief of Police Howard Rudolph, Hanton's successor, on July 14, 1986, established a detailed written policy concerning drug testing.

■ Although the plaintiffs have shown that Cleveland chiefs of police have issued policy statements on drug use and drug testing, the plaintiffs have not produced evidence to show that there exists a custom with the force of law that makes the chief of police the final policymaking official with respect to the drug testing of police. The evidence that they have produced merely indicates at best that the Chief of Police has the discretionary authority to produce policy statements. Discretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be "indistinguishable" from *respondeat superior* liability. *Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 925 (plurality opinion). There is no showing that the Director does not retain the power to review policy statements issued by the Chief of Police regarding drug testing. Consequently, we conclude that Chief Hanton did not possess the authority to make final policy regarding drug testing of police officers.

### C

■ The plaintiffs next contend that a final policymaker ratified Chief Hanton's actions. The plaintiffs correctly note that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final" policy. *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926 (plurality opinion). How-

ever, mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification. *Id.* Otherwise, the City would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from *respondeat superior* liability.

■ In the case at bar, Chief Hanton testified that he informed Turner, the Director of Public Safety, of his intention to drug test the cadets before the test was given. The evidence also shows that Turner fired the police recruits based upon the results of the drug test. However, the plaintiffs have shown no evidence that Turner expressly approved Hanton's decision or that he knew the manner in which the drug test was conducted. Although Turner may have acquiesced in the drug test, this is not enough to survive summary judgment. Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. at 927 (plurality opinion). Therefore, the plaintiffs must offer proof that an official charged with making final policy regarding drug testing of police expressly approved Chief Hanton's actions.[6] *Id.* At best, the evidence offered by the plaintiffs indicates that Turner acquiesced in Hanton's decisions regarding drug testing, but there is no showing that Turner or any other official expressly ratified the decision.

### IV

■ The plaintiffs next contend that the City and the individual defendants in their individual capacities violated their substantive due process rights because the drug testing procedures used were unreliable and because the City did not establish a testing procedure before it administered the test.[7] They also contend that they should have been given the opportunity to

---

6. However, even if it were shown that the municipality subsequently ratified the decision, the plaintiffs would then have to prove that the ratification was a "moving force" in causing the constitutional violation. *Williams v. Ellington*, 936 F.2d 881 (6th Cir.1991).

7. The substantive due process claim against the individual defendants is the only claim asserted against them on appeal.

take polygraph and blood tests before they were fired, and that they should have been permitted to re-test their own urine samples. Since we determined above that the City is not liable, we need only address this claim as it affects the individual defendants.

The defendants respond that the drug testing did not violate substantive due process because the tests used by SmithKline, the testing laboratory—enzyme immunoassay ("EMIT"), thin layer chromatography ("TLC"), and radioactive immunoassay ("RIA") tests—were highly reliable and were confirmed by another more accurate test after the cadets were fired. Therefore, they contend, the testing procedures were not arbitrary.

To support their contentions, the plaintiffs offered the testimony of Karen Rash, the technical head of SmithKline's Beachwood, Ohio laboratory. She testified that the urine samples collected on October 21 were tested with the EMIT test and the TLC test. The samples that tested positive using the EMIT and TLC tests were re-tested using the RIA test to confirm the results of the first two tests. Rash testified, however, that a RIA test was not the best available method to confirm positive results from an EMIT or TLC test. She testified that a gas chromatography/mass spectrometry test ("GC/MS") would be the best method of confirmation but that the GC/MS test was not used to confirm the results of the plaintiffs' test before the results were reported to the Cleveland Police Department.

Also in support of their argument, the plaintiffs offer the affidavit of Dr. Daniel A. Spyker, a board-certified toxicologist who claims to be an expert in drug testing. Dr. Spyker reviewed the testing procedures that SmithKline used, the depositions of the plaintiffs, and the deposition of Karen Rash. Dr. Spyker claimed that the EMIT, TLC, and RIA tests should be used only for the purposes of screening urine samples

for positive results.[8] Any positive results obtained from these tests, Dr. Spyker contends, should be confirmed by a more accurate test before disciplinary action is taken.

The testimony of Karen Rash and the affidavit of Dr. Spyker indicate that the testing procedure used by SmithKline was not the most accurate available. However, before the plaintiffs can succeed on their due process claim, they must show that the drug test does not bear a reasonable relation to a legitimate government interest, *Moore v. City of East Cleveland,* 431 U.S. 494, 498, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977), that the testing procedures were so unreliable that they were irrational or led to irrational results, *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), or that the procedures used to collect the urine "shock the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1951). Although Dr. Spyker's affidavit and Rash's deposition indicate that the EMIT, TLC, and RIA tests are not as accurate as other available tests, the plaintiffs have not shown that the use of these tests led to capricious or arbitrary results. Moreover, SmithKline ran a GC/MS test after the plaintiffs had been discharged, which confirmed the presence of marijuana in the plaintiffs' urine. Thus, the plaintiffs were terminated based upon tests that were accurate.

Further, although the procedures used to collect the urine should not be condoned, they do not shock the conscience or offend notions of liberty that are "implicit in the concept of ordered liberty." *Rochin,* 342 U.S. at 169, 72 S.Ct. at 208.

We also believe that the drug tests bear a reasonable relation to the legitimate government interest of preventing police officers, who are charged with the job of drug interdiction, from abusing illegal drugs. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 668–69, 109

8. *According to Dr. Spyker, the RIA, EMIT, and TLC tests are cheaper and faster to run and should only be used to identify the few positive samples from a large group of samples. J.A. at 253–54. Once a positive result is obtained using*

the EMIT, TLC, or RIA test, the sample should be re-tested with a more accurate test such as the GC/MS test to confirm the result. J.A. at 254–55.

S.Ct. 1384, 1391–92, 103 L.Ed.2d 685 (1989). Accordingly, we reject the plaintiffs' substantive due process claim against the individual defendants.

## V

We AFFIRM the judgment of the district court.