**MARKETING DISPLAYS, INC., Plaintiff,**

v.

**TRAFFIX DEVICES, INC., Defendant.**

**Civil Action No. 95–40230.**

United States District Court,
E.D. Michigan,
Southern Division.

June 2, 1997.

John A. Artz, Frank A. Angileri, Brooks & Kushman, Southfield, MI, for plaintiff.

Randall G. Litton, Price, Heneveld, Cooper DeWitt & Litt, Grand Rapids, MI, Jeanne–Marie Marshall, Richard W. Hoffman, Reising, Ethington, Barnard Perry & Milton, Troy, MI, for defendant.

### AMENDED MEMORANDUM OPINION AND ORDER

GADOLA, District Judge.

Before the court are three motions by plaintiff, Marketing Displays, Inc. ("MDI"). The first motion is a motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), filed on October 16, 1996, seeking to have this court find, as a matter of law, that the use by defendant, TrafFix Devices, Inc. ("TrafFix"), of the mark WIND-BUSTER infringes MDI's registered trademark WINDMASTER. The second motion, is a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6) or alternatively for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), filed on October 30, 1996, on Count II of TrafFix's counterclaim. The third motion, is a motion for sanctions, pursuant to Federal Rule of Civil Procedure 11, filed on December 10, 1996, alleging that TrafFix's counterclaim is not well-grounded in fact or in law. This court, pursuant to Local Rule 7.1(e)(2) (E.D.Mich. Nov. 7, 1994), has decided to dispense with oral argument and will decide the motions on the submitted briefs.

### I. Background

MDI manufactures and sells, *inter alia,* spring-mounted wind-resistant sign stands. MDI has been manufacturing and selling these sign stands since 1968 under the trademark WINDMASTER. The first sign stand sold under the WINDMASTER mark was a business-type wind-resistant sign stand that

was used to display advertisements, such as those seen at gas stations.

In the mid 1970's MDI modified its business-type wind-resistant sign stands in order to utilize the wind-resistant concept for traffic warning signs. The traffic-type wind-resistant sign stands were used to hold signs such as "ROAD WORK AHEAD" and "ROAD CONSTRUCTION AHEAD". These traffic-type, spring-mounted wind-resistant sign stands were then sold under the same mark WINDMASTER in the traffic control field.

MDI's WINDMASTER mark and products have been used continuously since 1968 and have enjoyed substantial commercial success. In the traffic control field, the WINDMASTER mark and traffic-type sign stands have been used continuously since 1976. In 1977, MDI registered WINDMASTER as a federal trademark.[1]

MDI sells several millions of dollars per year of these WINDMASTER sign stands and spends at least tens of thousands of dollars each year extensively promoting them in its advertising, literature, customer contacts, and trade shows. The name and product have each developed substantial goodwill and recognition in the sign stand industry.

In 1986 Mr. Jack Kulp started TrafFix Devices, Inc. to manufacture and sell traffic-type sign stands and related products. Prior to starting TrafFix, Mr. Kulp worked for Lear Siegler. During the time that Mr. Kulp was employed with Lear Siegler, it was a distributor of MDI's WINDMASTER traffic-type sign stands.

In the fall of 1994, TrafFix began selling a spring-mounted wind-resistant sign stand which was virtually identical to MDI's WINDMASTER product. In developing this sign stand, TrafFix sent one of MDI's WINDMASTER sign stands to Korea to be "reverse engineered."

On January 11, 1994, prior to adoption of the WINDBUSTER name, Mr. Donald

Stout, a registered patent attorney, conducted a trademark search, on Mr. Kulp's behalf, to determine the availability of the name WINDBUSTER as a trademark for traffic sign stands. In his opinion letter, Mr. Stout considered MDI's prior "WINDMASTER" registration and concluded that TrafFix's use of WINDBUSTER was not confusingly similar to MDI's mark.

On February 10, 1994, also prior to adoption of the WINDBUSTER name, TrafFix filed an application with the United States Patent and Trademark Office ("PTO") for the purpose of obtaining a Federal Registration for the WINDBUSTER mark.

The WINDBUSTER mark was published in the Trademark Gazette for an opposition period[2] beginning on March 14, 1995. No opposition was filed. On June 21, 1995, the Trademark Office allowed the WINDBUSTER trademark. On January 9, 1996, United States Trademark Registration No. 1,947,-386, ("386") for TrafFix's WINDBUSTER mark, issued.

On July 11, 1995, MDI filed its first complaint alleging: in Count I, Lanham Act trademark infringement; in Count II, violation of federal trade dress law; in Count III, Michigan common law unfair competition. On September 7, 1995, this court dismissed, without prejudice, Count III of MDI's complaint.

On August 21, 1996, MDI filed an amended complaint in which it ·realleged all three counts and added a fourth count claiming Lanham Act unfair competition. On September 30, 1996, TrafFix answered MDI's amended complaint and asserted two counterclaims. Count I alleged Lanham Act unfair competition and Count II alleged federal antitrust violations.

## II. Legal Standard

### a. Motion For Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings,

---

1. The United States Trademark Registration No. for "WINDMASTER" is 1,068,875 ("875").

2. The opposition period allows anyone who believes that they may be damaged by the registra-

tion of the mark to object to the registration of the mark and actually prevent the registration of the mark until all issues are resolved in a trademark proceeding.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Martin v. Ohio Turnpike Commission,* 968 F.2d 606, 608 (6th Cir.1992); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *60 Ivy Street Corporation v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). The court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment where proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). In other words, the disputed fact must be one which might affect outcome of the suit under the substantive law controlling the issue. *Henson v. National Aeronautics and Space Administration,* 14 F.3d 1143, 1148 (6th Cir.1994). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Accordingly, where a reasonable jury could not find that the non-moving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Feliciano v. City of Cleveland,* 988 F.2d 649 (6th Cir. 1993).

Once the moving party carries its initial burden of demonstrating that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the non-moving party must present more than just some evidence of a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986):

> There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Consequently, the non-moving party must do more than raise some doubt as to the existence of a fact; the non-moving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991).

**b.   Motion To Dismiss**

Federal Rule of Civil Procedure 12(b)(6) authorizes the district courts to dismiss any complaint which fails "to state a claim upon which relief can be granted." Rule 12(b)(6) affords a defendant an opportunity to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. In applying the standards under Rule 12(b)(6), the court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993); *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir. 1995). The court need not, however, accord the presumption of truthfulness to any legal conclusion, opinions or deductions, even if they are couched as factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 629 (9th Cir.1981); *Mitchell v. Archibald & Kendall, Inc.,* 573 F.2d 429, 432 (7th Cir. 1978); *Sexton v. Barry,* 233 F.2d 220, 223

(6th Cir.1956). Dismissal for failure to state a claim is disfavored:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *See also Cameron v. Seitz,* 38 F.3d 264, 270 (6th Cir.1994) (stating that a motion to dismiss should be denied unless "it is clear that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief.").

### III. Applicable Law

#### a. Trademark Infringement

█ In order to prevail on a motion for summary judgment in a trademark case, the moving party must establish that an accused name or trademark infringes another's trademark rights so that the accused party's mark is "likely to cause confusion" in the minds of purchasers or prospective purchasers. 15 U.S.C. § 1114. *See also Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988). The determination of that issue is a question of law that may properly be decided on a motion for summary judgment. *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1086 (6th Cir.1983).

█ The legal test for determining whether a "likelihood of confusion" exists is well settled. In *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642 (6th Cir.1982), the Sixth Circuit set forth eight factors that are relevant to the likelihood of confusion:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Id.* at 648 (quoting *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979)). In *Wynn,* the Sixth Circuit explained how the *Frisch* factors are to be applied:

> These factors are simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested marks. They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful. As we said in *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 834 (6th Cir.1983), "[t]he general concept underlying likelihood of confusion is that the public believe that 'the mark's owner sponsored or otherwise approved of the use of the trademark.'" (citations omitted).

*Id.* at 1186.

#### b. Monopolization

To establish the offense of monopolization or attempted monopolization in violation of § 2 of the Sherman Act, TrafFix must show that MDI:

> ... either unfairly attained or maintained monopoly power. (citation omitted). Monopoly power consists of 'the power to control prices or exclude competition.' (citation omitted). An attempted monopolization occurs when a competitor, with a 'dangerous probability of success,' engages in anti-competitive practices the specific design of which are, to build a monopoly or exclude or destroy competition. (citations omitted). In order to succeed on either a monopolization or attempt to monopolize claim plaintiffs must establish the relevant product and geographic markets in which they compete with the alleged monopolizers. (citations omitted).

*Smith v. Burns Clinic Medical Center, P.C.,* 779 F.2d 1173, 1175–76 (6th Cir.1985). (quoting citation omitted). *See also White & White, Inc. v. American Hospital Supply Corp.,* 723 F.2d 495, 506–07 (6th Cir.1983) (stating that "[t]he offense of attempt to monopolize ... is composed of the following elements: 1. Specific intent to monopolize; 2. Anti-competitive conduct; 3. A dangerous probability of success.") The *White & White* court also stated that a "[s]pecific intent to monopolize may be inferred from evidence of

anti-competitive conduct, (citation omitted) but not from legitimate business practices aimed only at succeeding in competition. (citations omitted)." *White & White*, 723 F.2d at 507.

### c. Sanctions

■ "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well-grounded in fact, legally tenable, and 'not interposed for any improper purpose.'"[3] *McGhee v. Sanilac County*, 934 F.2d 89, 93 (6th Cir. 1991) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 392–94, 2454, 110 L.Ed.2d 359 (1990)). In deciding whether to impose sanctions, this court must be sensitive to concerns that sanctions may "chill" the attorney creativity and vigorous advocacy which are inherent components of our civil justice system. *See, e.g., Yancey v. Carroll County, Ky.*, 674 F.Supp. 572, 575 (E.D.Ky.1987), *aff'd*, 884 F.2d 581 (6th Cir. 1989).

## IV. Analysis

As a matter of "housecleaning", this court will, once again, dismiss, without prejudice, Count III of MDI's amended complaint for the reasons set forth in this court's September 7, 1995 order.[4] MDI is again directed to M.C.L. § 600.5856, regarding the tolling of the state statute of limitations. *See also Lee v. Grand Rapids Bd. of Educ.*, 148 Mich.App. 364, 384 N.W.2d 165 (1986); *Shrader, Inc. v. Ecclestone Co.*, 22 Mich.App. 213, 177 N.W.2d 241 (1970).

### a. Trade Mark Infringement

■ At the outset, TrafFix argues that there is a presumption that the WINDBUSTER mark does not infringe on the WINDMASTER mark since the Patent and Trademark Office allowed the WINDBUSTER mark even though they were "presumably" aware of the WINDMASTER mark. TrafFix, however, cites no legal authority, and this court was unable to find any authority that stands for the proposition that it is entitled to a presumption of no likelihood of confusion because the PTO allowed its mark. Moreover, TrafFix offers no direct evidence that the PTO was even aware of the WINDMASTER mark. Had TrafFix brought the WINDMASTER mark to the attention of the PTO, as it did to its own trademark attorney prior to his issuance of an opinion letter, TrafFix's argument would be more persuasive. This, however, was clearly not done by TrafFix in this case. As such, this court will engage in a *Frisch* factor analysis to determine whether the WINDBUSTER mark infringes on the WINDMASTER mark. This analysis is undertaken without giving TrafFix the benefit of a presumption that its mark is not confusingly similar to the WINDMASTER mark.

### 1. Strength of the plaintiff's mark.

■ MDI contends that it owns incontestible trademark rights in the WINDMASTER mark, as a matter of law, since the WINDMASTER mark has been registered for more than five years, i.e. since 1977. *See Wynn Oil Co.* 839 F.2d at 1187.

TrafFix, on the other hand, argues that the WINDMASTER trademark applies only to

---

3. Rule 11 provides, in relevant part, that:
    **(b) Representations to court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
       (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
       (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; ... Fed.R.Civ.P. 11(b)(1)–(3).

4. This court was informed, by letter dated January 17, 1997, from MDI's principal counsel, that MDI never received this court's September 7, 1995 order.

"business-type WINDMASTER" products, which are separate from the traffic sign stand products. TrafFix points to the description of the WINDMASTER product listed in the registration: *"metal, non-tippable display apparatus for use in holding and displaying signs,* posters, metal panels, and advertising messages, in class 6." (emphasis added) However, this court finds that the above product description is not so constrictive as to limit the WINDMASTER mark to only a business-type application. Moreover, the description of the WINDBUSTER product listed in TrafFix's registration is virtually identical to that for the WINDMASTER product, to wit: *"yieldable, self-uprighting metallic stand for use in holding and displaying signs,* fabric panels, rigid panels, and the like." (emphasis added). As such, this court finds that MDI does have incontestable trademark rights in the WINDMASTER mark.

■ Even if this court did not determine that MDI enjoys incontestable trademark rights in the WINDMASTER mark, it would, nevertheless, find that the WINDMASTER mark is strong. MDI has used the WINDMASTER mark in the traffic control field for over twenty years with substantial success. There have been over 28 million dollars in sales of WINDMASTER sign stands. Moreover, MDI has expended large sums of money in advertising the WINDMASTER line of stands which has resulted in widespread recognition. Even Mr. Kulp, TrafFix's president and principal owner, acknowledged that WINDMASTER sign stands were well received. As such, this court finds that this factor favors MDI.

### 2. Relatedness of the goods.

TrafFix cannot credibly represent to this court that the WINDBUSTER product is not virtually identical to the WINDMASTER product as evidenced by a mere comparison of the advertising literature of the respective parties. Both products use a pair of closely spaced vertically oriented coil springs to hold the same type of sign upright on a narrow, four legged base. Indeed, TrafFix has already conceded that the WINDBUSTER product was at least "reverse engineered."

Moreover, TrafFix's attempt to highlight minor differences in the goods, such as color, is not compelling. As such, this court finds that this factor favors MDI.

### 3. Similarity of the marks.

■ At the outset, this court rejects TrafFix's attempt to dissect the marks in question. The Sixth Circuit, in *Little Caesar Ent., Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568 (6th Cir.1987) stated:

> Although both marks employ the word "Caesar," we are warned by Professor McCarthy that a trademark 'should not be split up into its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion. It is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important.'

*Id.* at 571. (quoting Professor J. Thomas McCarthy, in *Trademarks and Unfair Competition* § 23:15 (2d ed.1984)).

Here, the WINDBUSTER mark is similar both in appearance and sound and conveys substantially the same meaning as the WINDMASTER mark. Both marks have the same number of letters with the first and fifth letters being capitalized in each mark. Only two letters are different between the two marks—the "MA" from WINDMASTER and the "BU" in WINDBUSTER. Both marks are black and have a similar font or script.

When spoken, both marks sound substantially similar to each other. Both marks have the same number of syllables and contain the identical prefix "WIND," and suffix "STER." Most compelling, is that the dominant portions of each mark, "WIND," are identical. The Federal Circuit has stated that:

> [A]particular feature of a mark may be more obvious or dominant, and therefore, when determining likelihood of confusion, greater weight ought to be given to the force and effect of such a feature.

*Kangol Ltd. v. Kangaroos U.S.A. Inc.,* 974 F.2d 161, 163 (Fed.Cir.1992).

TrafFix argues that "WIND" is not the dominant portion of the respective marks as evidenced by MDI's use of the "MASTER" portion of the mark in its other sign stand trademarks, i.e. TRAFFICMASTER and STEELMASTER. This argument, however, belies the fact that the "WIND" prefix is the portion of the mark that purchasers of wind resistant sign stands remember regardless of whether MDI utilizes the "MASTER" portion of the mark in its other products.

Finally, both WINDBUSTER and WIND-MASTER connote the same meaning, i.e. that the mark may be related in some way to the ability of the product to withstand windy conditions. As such, this court finds that this factor favors MDI.

### 4. Evidence of actual confusion.

As evidence of actual confusion, MDI offers the declarations of several of its employees who state that there have been instances of actual confusion by customers calling MDI about WINDBUSTER signs. MDI also offers the declaration of Ron Lunt, a buyer from the City of Dover, Delaware.

▋ TrafFix argues that MDI's proffered evidence is inadmissible hearsay, and requires that this court make credibility determinations which are not permitted in summary judgment proceedings. MDI responds that such evidence is admissible as non-hearsay or as a state of mind exception to the hearsay rule pursuant to Federal Rule of Evidence 803(3). Both parties cite cases in support of their respective positions, none of which are binding precedent on this court. Without entering into a lengthy analysis, this court concludes that it is in agreement with the reasoning of those cases cited by TrafFix which hold that employee testimony regarding alleged telephone conversations with purchasers is unreliable hearsay which does not invoke the 803(3) state of mind exception.

▋ Mr. Lunt's declaration, however, in which he states that he "assumed that WINDBUSTER was just another product being offered by MDI in its sign stand line," cannot be considered inadmissible hearsay. Mr. Lunt is plainly stating that he was, indeed, confused as to the origin of WIND-BUSTER. Nevertheless, Mr. Lunt's testimony, alone, is *de minimis*.

▋ TrafFix goes on to urge this court to find that, because the evidence of actual confusion is *de minimis* and because the parties are in direct competition in the traffic control marketplace, an inference of *no* likelihood of confusion should be made. For that proposition, TrafFix quotes a portion of the Sixth Circuit's holding in *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir.1991). There, the Sixth Circuit stated: "Indeed, the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks *may* even lead to an inference that no likelihood of confusion exists. (citation omitted)." (emphasis added) [5]

However, TrafFix's reliance on *Homeowners* is misplaced since there, the Sixth Circuit, without explicitly deciding whether to draw such an inference, only stated that such an inference *may* be drawn. In addition, the Sixth Circuit recognized that such an inference may be proper only where "the parties have been doing business in the same area for some time...." *Id.* (citing cases in which business was conducted over three years and fifteen years.) In the instant case, at the time the complaint was filed, the parties had been competing for less than a year. This is not a sufficient amount of time from which to draw an inference of no actual confusion. Moreover, this court notes that TrafFix has not proffered any evidence of its own showing that no actual confusion exists. As such, this court finds that this factor favors neither party.

---

**5.** This court will presume that counsel for Traf-Fix, merely misstated the holding in *Homeowners* to this court. Counsel quoted the *Homeowner's* language, in the above parenthetical, as: "...  . Indeed, the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks *that* even lead to an inference that no likelihood of confusion exists." (emphasis added). In the event, however, that such a misstatement is made in the future, by either party, there will be no such favorable presumption and this court will explore the imposition of Rule 11 sanctions.

#### 5. Marketing channels used.

There is apparently no dispute that the parties use the same marketing channels as TrafFix does not contest this factor in its response. As such, this court finds that both parties market their respective products to contractors, government entities, and utilities and that this factor favors MDI.

#### 6. · Likely degree of purchaser care.

The relevant buyer class for traffic-type products is professional purchasers. The Sixth Circuit, in *Homeowners,* stated that:

When the relevant buyer class is composed of such professional purchasers the likelihood of confusion is lower. That is, 'while two marks might be sufficiently similar to confuse an ordinary consumer, a professional buyer or an expert in the field may be more knowledgeable and will not be confused.'

*Homeowners,* 931 F.2d at 1111 (citing 2 J. McCarthy § 23:29, at 135). As such, this factor favors TrafFix.

#### 7. Defendant's intent in selecting the mark.

In the instant case, Mr. Kulp requested an opinion letter from his trademark attorney prior to marketing his product under the WINDBUSTER mark. That letter concluded that WINDBUSTER and WIND-MASTER were not confusingly similar. Moreover, the Trademark Office's allowing the mark, although not an implicit finding that the WINDBUSTER mark was not confusingly similar, *see* discussion *supra,* is evidence of an absence of improper intent on the part of TrafFix in selecting the mark. As such, this factor favors TrafFix.

#### 8. Likelihood of expansion of the product lines.

Both parties concede that this factor does not favor either party.

Thus, after examining the eight *Frisch* factors, this court concludes that there is a clear likelihood of confusion between the WINDMASTER and WINDBUSTER marks. The closely related nature of the products and the similarity of the marks make it highly probable that a purchaser of WINDBUSTER would assume that it has some affiliation with WINDMASTER products.

#### b. Monopolization

At the outset, this court will treat MDI's motion to dismiss the counterclaim, or in the alternative summary judgment, as a motion for summary judgment. Where a motion to dismiss for failure to state a claim is made under Rule 12 and "matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b)(6)

The parties are in agreement that "before reaching the merits of an antitrust claim, it is necessary to identify the relevant markets." *Potters Medical Center v. City Hospital Assn.,* 800 F.2d 568, 574 (6th Cir. 1986). The Supreme Court has set forth the legal test for determining the relevant market as follows:

When a product is controlled by one interest, without substitutes available in the market, there is monopoly power.... *But where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others.* If it were not so, only physically identical products would be a part of the market.

*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956) (emphasis added). The Sixth Circuit has interpreted this as requiring a determination of those products "that are either (1) identical to or (2) available substitutes for defendant's product or service." *White & White,* 723 F.2d at 500. The *White & White* court went on to emphasize the "reasonable interchangeablity" standard, *id.,* "which allows for closely related product substitutes to be considered in the relevant market...." *Car–Freshner Corp. v. Auto Aid Manufacturing Corp.,* 195 USPQ 747, 438 F.Supp. 82 (N.D.N.Y.1977).

TrafFix, in its counterclaim, defines the relevant market as "wind resistant sign

stands *mounted on dual springs.*" (emphasis added). MDI, on the other hand, contends that the relevant market is "wind-resistant sign stands."[6] Later, in its response to MDI's motion, TrafFix amends its definition of the relevant market, or submarket, to be "wind resistant sign stands with dual springs [that] *are designed for use with 4' × 4' rigid signs.*"

In support of its motion, MDI offers evidence of third party competitors that use other types of spring-type mechanisms, not just dual springs. For instance, Eastern Metals of Elmira, Dicke Tool Co., and Sign–Up Corp., all of which are admitted by Jack Kulp, TrafFix's president and principal owner, to be direct competitors to MDI and TrafFix in the marketplace.[7] Those company's compete with the WINDMASTER and WINDBUSTER products by selling resiliently mounted sign stands which use, respectively, a single fiberglass leaf spring mechanism, a single horizontal coil spring mechanism, and a single enclosed tension spring mechanism.[8]

TrafFix claims that a genuine issue of material fact exists for three reasons. First, it argues, as mentioned above, that the relevant market is wind resistant sign stands with dual springs that are designed for use with 4' × 4' rigid signs. However, this argument is directly contradicted by Kulp's testimony, quoted above, in which he admits that TrafFix's sign stands compete with the sign stands of various third-parties, including Dicke Tool, Korman, Work Area Protection, Eastern Metals, Sign–Up, and S & S.[9]

■ It is generally established that, under Rule 56, a party may not create a genuine issue of material fact by submitting an affidavit, after a motion for summary judg-

---

**6.** TrafFix correctly points out that this definition would include MDI's business sign stands which are not at issue here. As such, the court will presume, for purposes of the instant motion only, that when MDI refers to "wind-resistant sign stands," it is referring to "wind-resistant [traffic] sign stands."

**7.** At Mr. Kulp's deposition on August 5, 1996, the following testimony was elicited:

Q: What products in the marketplace does the WindBuster sign stand compete with?
A: The SteelMaster.
Q: What other product?
A: Eastern Metal Sign stand, Elmira. S & S sign stand; Skip and Smith I think the S & S stands for. Dicke Tool sign stand. Sign–Up Corporation sign stand. Korman Signs sign stands, Virginia. And Work Area used to have a sign stand, I don't know that they still have them.
Q: And—
A: Bone Safety Sign, that's another one.
Q: And Eastern Metal, the full name of that company is Eastern Metal of Elmira?
A: That's my understanding.
Q: What product of these companies does the WindBuster compete with?
A: Competes with their rigid sign holders.
Q: All these companies have a wind resistant sign holder that has some type of spring mechanism in it?
A: That's my understanding.
Q: So any one of these sign stands of these companies have a wind resistant sign stand with a resilient member that competes with the WindBuster?
A: That's my understanding.

**8.** At Mr. Kulp's deposition on August 5, 1996, the following testimony was elicited:

Q: What products in the marketplace does the Windbuster sign stand [TrafFix's product] compete with?
A: The SteelMaster [MDI's product].
Q: What other product?
A: Eastern Metal sign stand, Elmira, S & S sign stand; Skip and Smith I think the S & S stands for. Dicke Tool sign stand. Sign–Up Corporation sign stand. Korman Signs sign stands, Virginia. And Work Area used to have a sign stand, I don't know that they still have them.
Q: All three of those products you just mentioned; the Eastern Metal *flat spring*, Dicke Tool *horizontal spring* and the Sign–Up *power cell*, they are all products which compete in the marketplace with the Windbuster sign stand [TrafFix's product], are they not?
A: After a fashion.
Q: They do compete?
A: Yes.

**9.** It is also telling that in TrafFix's response to request no. 21 of MDI's second set of requests for admissions, TrafFix admits "that it is using the mark WINDBUSTER in connection with *wind-resistant traffic sign stands.*" Certainly, this was an opportune time for TrafFix to correct MDI by means of a denial and to state what it considered the relevant market for its WINDBUSTER product to be. TrafFix, however, did not specify that it was using the WINDBUSTER mark in connection with "wind resistant sign stands with dual springs that are designed for use with 4' × 4' rigid signs" much less state that it was using the mark in connection with "wind resistant sign stands mounted on dual springs."

ment has been made, containing conclusory allegations that contradict prior admissions or deposition testimony. *See Dotson v. United States Postal Service,* 977 F.2d 976, 978 (6th Cir.1992) (plaintiff's affidavit opposing summary judgment, which contradicted prior statements that he was "fired" from prior employment, failed to create a genuine issue of material fact in a Title VII wrongful termination action); *Freeman v. Unisys Corp.,* 898 F.Supp. 485, 490 (E.D.Mich.1995) (stating that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony."); *United States v. Certain Real Property,* 791 F.Supp. 171, 173 (E.D.Mich.1992) (defendant's affidavit contradicting admissions in deposition testimony concerning knowledge of illegal drug activities deemed insufficient to create a genuine issue of material fact). *See also Miller v. A.H. Robins Co., Inc.,* 766 F.2d 1102, 1105 (7th Cir.1985) ("Parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions."). *Francis v. Gaylord Container Corp.,* 837 F.Supp. 858, 864 (S.D.Ohio), *aff'd,* 9 F.3d 107 (1993) (contradictory post-deposition affidavits by a witness are improper and should not be considered by the court in deciding the summary judgment motion) (citing *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 315 (6th Cir.1989)).

Moreover, TrafFix offers no evidence to support its position that the relevant market is wind resistant sign stands with dual springs that support 4' × 4' rigid signs. In fact, at least four of MDI's and TrafFix's competitors, Eastern Metal, Sign–Up, Dicke Tool, Services & Materials, expressly state in their literature that their single spring systems can be used for rigid signs. As such, this argument is rejected outright.

Second, TrafFix argues that there is a genuine question of material fact because MDI in several filings with the PTO stressed that dual spring stands perform different functions than single spring stands. This "evidence", however, is too casual to be persuasive particularly in light of the acknowledged single spring competitors of TrafFix

and MDI. This argument is, therefore, rejected.

Finally, TrafFix argues that since many governmental agencies, in their bidding specifications for stands for 4' by 4' signs, prescribe only dual spring stands, there is genuine question of material fact. However, of the five bid specifications provided to this court by TrafFix, only two specifically call for a dual spring system and a third specification arguably calls for such a system by referencing a model that uses the dual spring system. Such "evidence" is *de minimis* and does not create a genuine issue of material fact.

As such, this court concludes that no reasonable trier of fact could find that the relevant market is wind resistant sign stands mounted on dual springs, much less wind resistant sign stands with dual springs that are designed for use with 4' × 4' rigid signs. Instead, a reasonable trier of fact would have to find that the relevant market is wind-resistant sign stands. Because TrafFix's definition of the relevant market is plainly incorrect, and because that definition is inexorably intertwined with its monopolization claim, summary judgment as to that claim is appropriate.

Regardless, TrafFix has failed to put forth any evidence that MDI has engaged in anti-competitive activity. TrafFix merely alleges that MDI is engaged in anti-competitive activity by virtue of asserting trade dress rights. However, it is axiomatic that the patent and trade dress laws protect different interests, *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657–58 (7th Cir. 1995), and that courts allow a party to assert trade dress rights after its patent has expired. *See, e.g., Kohler Co. v. Moen Inc.,* 12 F.3d 632, 638 (7th Cir.1993); *Application of Mogen David Wine Corp.,* 51 C.C.P.A. 1260, 328 F.2d 925, 930 (C.C.P.A.1964); *Zip Dee, Inc. v. Dometic Corporation,* 931 F.Supp. 602, 612 (N.D.Ill.1996).

TrafFix argues that cases finding trade dress rights after the patent has expired only address design patents. TrafFix contends that where the patent in question is a utility patent, courts have declined to extend trademark protection. However, TrafFix fails to

cite any authority for that proposition. Moreover, TrafFix fails to cite any authority, and this court was unable to find such authority, that stands for the proposition that the mere assertion of trade dress rights by a party after its patent rights have expired, even where the expired patent was a utility patent, is an unlawful attempt to monopolize in contravention of 15 U.S.C. § 2.

This court finds that the mere assertion of trademark rights does not constitute a dangerous probability that MDI would gain monopoly power in the market of wind-resistant signs.

TrafFix is certainly entitled to and will have the opportunity to attack the validity of MDI's trade dress claims on the grounds that the dual spring design is functional when the time comes. This court merely holds, at this time, that TrafFix has not offered any evidence of anti-competitive activity and that therefore summary judgment, in favor of MDI, is appropriate.

**c.  Sanctions**

    At the outset, it should be noted that TrafFix has failed to timely [10] respond to MDI's motion for Rule 11 sanctions.[11]  That motion sought sanctions for the filing of an antitrust counterclaim by TrafFix even though there was evidence elicited during discovery which contradicted that claim. Without engaging in a protracted analysis, this court finds that Rule 11 sanctions are not appropriate in this instance. While this court will dismiss TrafFix's counterclaim, it does not find that this claim is so ungrounded in fact or law that sanctions are warranted. Suffice it to say, this court remains sensitive to concerns that sanctions may "chill" the attorney creativity and vigorous advocacy which are inherent components of our civil justice system. *See, e.g., Yancey v. Carroll County, Ky.,* 674 F.Supp. 572, 575 (E.D.Ky. 1987), *aff'd,* 884 F.2d 581 (6th Cir.1989).

**10.**  Since MDI filed its motion for Rule 11 sanctions on December 10, 1996, TrafFix's response was due on December 30, 1996.

**11.**  Ms. Marshall, counsel for TrafFix, has represented to this court that an agreement was reached between the parties to extend the response deadline to January 10, 1997. This court, however, did not approve any such extension to

Instead, this court is more troubled by Traffix's conduct during the litigation thus far.  *See* discussion *supra* notes 5, and 11. Although this conduct has been less than exemplary, this court does not find that it has risen to the level that warrants the imposition of sanctions.  Rather, this court trusts that such behavior will cease in the future.

### V.  Conclusion

In sum, this court, for the reasons discussed above, will grant MDI's motions, pursuant to Federal Rule of Civil Procedure 56(c), for summary judgment on its trademark infringement claim and on TrafFix's antitrust counterclaim.  This court will, however, deny MDI's motion, pursuant to Federal Rule of Civil Procedure 11, for sanctions.

### *ORDER*

**IT IS HEREBY ORDERED** that plaintiff, MARKETING DISPLAYS, INC.'s, motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), on Count I of its amended complaint, is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant, TRAFFIX DEVICES, INC., is immediately and permanently **ENJOINED** from using the mark **"WINDBUSTER."**

**IT IS FURTHER ORDERED** that plaintiff, MARKETING DISPLAYS, INC.'s, motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), on Count II of defendant's counterclaim, is **GRANTED** and that defendant, TRAFFIX DEVICES, INC., take nothing.

**IT IS FURTHER ORDERED** that MDI's motion for sanctions, pursuant to Federal Rule of Civil Procedure 11, is **DENIED.**

**SO ORDERED.**

respond nor was it even made aware of such an agreement.  *See* Local Rule 7.1(f) (E.D.Mich. Nov. 7, 1994).  Yet again, this court must caution the parties that any similar future conduct will not be countenanced by this court and may very well result in the imposition of Rule 11 sanctions.