Anthony Duane HODGES, Plaintiff,

v.

VAN BUREN COUNTY TENNESSEE, et al., Defendants.

Case No. 4:15–cv–53

United States District Court, E.D. Tennessee, Winchester Division.

Signed January 4, 2017

Everett L. Hixson, III, Timothy L. Mickel, Charles M. Nicely, Evans Harrison Hackett PLLC, Chattanooga, TN, for Plaintiff.

Howard L. Upchurch, Law Office of Howard L. Upchurch, Pikeville, TN, Thomas E. LeQuire, B. Thomas Hickey, Spicer Rudstrom, PLLC, Chattanooga, TN, for Defendants.

## ORDER

HARRY S. MATTICE, JR., UNITED STATES DISTRICT JUDGE

Before the Court is Defendants' Motion for Summary Judgment (Doc. 25). For the reasons stated herein, Defendants' Motion will be **GRANTED**.

## I. BACKGROUND

Plaintiff Anthony Duane Hodges ("Plaintiff") was hired as an Equipment Operator for the Van Buren County Highway Department ("the Highway Department" or "the Department") in October 2010. At the time, the Department was under the control of then County Road Superintendent Danny Hodge.[1] In late 2010, Plaintiff, who had some experience with computers, was asked to assist the Department's secretary in transitioning to a new computer system. Ultimately, Plaintiff took over the secretary's position full time. (Doc. 27–7 at 3–4, 8).

Plaintiff's duties in the office were broadly defined, but involved, for the most part, secretarial, accounting, and bookkeeping functions. For ease of reference, the Court will refer to his position within the Department as "Secretary/Accountant/Bookkeeper." As Secretary/Accountant/Bookkeeper, Plaintiff was the only employee who worked in the office other than the County Road Superintendent. Plaintiff

describes the position as purely "ministerial" and "administrative" in nature, and argues that it involved no policymaking authority. (Doc. 27 at 17). The Secretary/Accountant/Bookkeeper has unfettered access to confidential information, including employees' social security numbers and all accounting records pertinent to the Department's budget. (Doc. 25–1 at 59–60, 62). Plaintiff was also responsible for overseeing payroll, and delivering paychecks to the County Road Superintendent for his signature. Plaintiff himself, however, never signed payroll checks.

Plaintiff did not personally create the Department's budget, but he was in constant contact with the County Trustee to track state and federal funding coming into the Department. (*Id.* at 78). Plaintiff also prepared monthly budget reports for the County Road Superintendent. Former County Road Superintendent Hodge reviewed these budget reports, signed them, and sent them to state officials. By Plaintiff's admission, Hodge never made any changes to Plaintiff's reports before signing them. (*Id.* at 63). Finally, the Secretary/Accountant/Bookkeeper was responsible for assisting state officials in conducting twice-yearly audits of the Department's budget. Plaintiff provided the officials with information such as invoices and purchase orders, and answered any questions they asked. While then Superintendent Hodge would occasionally be present for portions of these audits, he oftentimes was not. (*Id.*). In short, it is clear that while Plaintiff had no official authority to set the Department's budgetary priorities, he played an integral role in managing the budget and ensuring that the County Road Superintendent had the

---

1. County Road Superintendent is an elected position, and is defined as the "chief administrative officer" of the various County High-

way Departments in Tennessee. *See* Tenn. Code Ann. § 54–7–103; Tenn. Code Ann. § 54–7–105.

information necessary to make informed decisions regarding same.[2]

In December 2013, Former County Road Superintendent Hodge became ill and took a leave of absence. During this time, Assistant Superintendent Randy Smith[3] was in charge of all road work operations, but Plaintiff was in charge of all administrative duties. In early 2014, Randy Smith resigned because he was not officially appointed as Interim County Road Superintendent. At this time, Plaintiff assumed Randy Smith's duties, and on May 24, 2014 he was named by Hodge as Interim Successor Superintendent in the event that Hodge became unable to serve as County Road Superintendent. (Doc. 25–1 at 15). During Hodge's leave of absence, Plaintiff was in contact with Hodge every day. (Doc. 27–7 at 17). At Hodge's request, Plaintiff served as a liaison between the Department's employees and the County Road Superintendent. (*Id.* at 18) (Plaintiff testified that "Danny [Hodge] had asked me to tell everyone if there's a problem to get with me and then I would talk with him and then get back with everyone on what needed to be done or anything like that.") Accordingly, whenever an employee had a question regarding the Department's policies or practices, Plaintiff would contact Hodge and relay Hodge's answers to the employee. (*Id.*). Occasionally, however, Plaintiff would simply answer employee questions for "simple stuff" or "common sense stuff." (*Id.* at 18–19).

In early 2014, Randy Oakes (hereinafter "Defendant Oakes," "Superintendent Oakes," or "Oakes") announced his candi-

dacy for the August 2014 election for County Road Superintendent.[4] Oakes had formerly worked in the Department, but resigned in 2012 because of a disagreement with Former Superintendent Hodge. (Doc. 25–1 at 31). During the Democratic primary, Oakes asked Plaintiff to support him in the election, and Plaintiff agreed to do so. (Doc. 27–7 at 31). After the Democratic primary, Robert Walling announced his candidacy for County Road Superintendent as an Independent. (Doc. 25–1 at 31). Because Plaintiff had been lifelong friends with Walling, Plaintiff decided to support Walling instead of Oakes in the general election. (*Id.* at 68). It is undisputed that Plaintiff and Oakes never spoke about Plaintiff's shift in allegiance. It is equally undisputed, however, that during the election season Oakes saw Plaintiff with Bruce Dunn as Dunn was placing a yard sign in support of Walling on the side of a county highway. (Doc. 27–9 at 11–14). This was the only time Oakes saw Plaintiff doing anything that could be construed as campaigning for Walling.

Two pertinent events occurred shortly before the August 2014 election. The first involves Plaintiff's interaction with an agent from the Tennessee Bureau of Investigations ("TBI") in July 2014. The Parties have vastly different accounts of this interaction. Oakes avers that Plaintiff called Oakes after speaking with a TBI agent at the office.[5] During this conversation, Defendant claims that Plaintiff stated that he allowed the TBI agent to look at "all of [Oakes'] personal information." (Doc. 25–1 at 44). Believing that his social

---

**2.** In addition to these duties, Plaintiff was occasionally paid overtime to respond to calls regarding routine Department business such as tree removal and roadkill cleanup. (Doc. 25–1 at 66).

**3.** Two people with the last name "Smith" worked for the Department during the relevant time period. To avoid confusion, the

Court will refer to such employees by full name.

**4.** Former Superintendent Hodge was not seeking re-election.

**5.** Oakes' wife answered the phone, but relayed the information to Oakes.

security number may have been compromised, Oakes subscribed to an identity theft protection service. (*Id.*). Oakes' wife testified that during this conversation, Plaintiff did not even say that the person to whom he gave Oakes' personal information was a TBI agent. She believed him to be a "rank stranger." (Doc. 27–12 at 12–13). Mrs. Oakes further testified that in August of 2014 she spoke with Plaintiff again about the situation, and claims that at that time Plaintiff said that he made the entire story up. (*Id.* at 15). Plaintiff, however, testified that a TBI agent came into the Highway Department office investigating Oakes' qualifications to run for County Highway Superintendent, and that he only allowed the agent to view Oakes' name, date of hire, job title, and pay. (Doc. 25–1 at 72).

Second, and also in July 2014, Oakes reached out to Sharon Mooneyham to ask if she would be interested in being his secretary (i.e., to replace Plaintiff) in the event that he won the election. (Doc. 25–1 at 36). Although Mooneyham initially responded "you already have a secretary," she ultimately accepted the position. (Doc. 25–1 at 90). Mooneyham submitted an application for the position on August 28, 2014, and her first day of work was listed as September 1, 2014. (Doc. 27–10 at 8–9); (Doc. 27–6 at 4).

Oakes defeated Walling in the August 2014 election and officially became County Road Superintendent on September 1, 2014 at midnight. Oakes testified that at his training, he was instructed to take possession of the Highway Department's premises immediately upon becoming Superintendent. (Doc. 27–9 at 30). September 1, 2014 was Labor Day; accordingly, the office was closed. Nonetheless, at midnight on September 1, 2014, Oakes went to the Department's office and gained entry to the facility with the help of the night

watchman, Ricky Delong. (*Id.* at 28–29). Oakes then relieved the night watchman of his duties and replaced him with another security guard, Corey Oakes (Oakes' cousin). (*Id.* at 29–30); (Doc. 27–10 at 13–14). Shortly thereafter, at around 12:15 a.m., Oakes, accompanied by the County Sheriff, went to Plaintiff's home "demanding that Plaintiff return his county vehicle and the keys to the highway department." (Doc. 27 at 4). Oakes testified that he brought the County Sheriff with him "[j]ust to have a witness." (Doc. 27–9 at 32). Conspicuously, however, Oakes did not bring the County Sheriff to serve as a witness when he relieved Delong of his duties. (*Id.* at 33). After turning over his keys and the Department vehicle, Plaintiff testified that he

> informed Mr. Oakes that [he] could come down to the Highway Department later that morning [September 1, 2014] to help assist him with the transition as he took office. In response, [Oakes] told [Plaintiff] that he did not want [Plaintiff] coming to the Highway Department that day, and that he didn't care if [Plaintiff] came the next day, either.

(Doc. 27–13 at 2). Plaintiff characterized Oakes' demeanor as "aggressive," which surprised Plaintiff because he "had never had any unpleasant interactions with [Oakes] previously." (*Id.*). As instructed, Plaintiff did not come to the office on Labor Day, but did return on September 2, 2014.

On the morning of September 1, 2014, Oakes, Mrs. Oakes, Mooneyham, Corey Oakes, and Jimmy Hopkins,[6] went into the office to change locks, look over paperwork, check on the budget, and to organize the facility. (Doc. 27–9 at 37). At this time, Oakes discovered paperwork that led him to believe that Plaintiff had been falsifying documents and otherwise performing his job in a substandard manner. First, Oakes

---

**6.** Oakes hired Hopkins as his Assistant Road Superintendent. (Doc. 27–11 at 6).

found a document entitled "Van Buren County Highway Department Monthly Time Sheet." (Doc. 25–1 at 25). The Time Sheet was marked for the period of September 1, 2014 through September 15, 2014, and was completely filled out for all of the hours every employee was supposed to work during this period. Oakes found this improper because the employees had yet to actually work those hours. (Doc. 25–1 at 45). Second, Oakes found documents indicating that Plaintiff had been paying himself overtime. Oakes thought this to be improper because Plaintiff was a salaried employee. (Doc. 25–1 at 46). Third, Oakes discovered that Plaintiff had approved the payment of unused sick leave payouts to employees in August of 2014. Oakes believed that this was improper because he thought employees could only be given such payouts in June and December. (Doc. 27–9 at 62); (Doc. 27–7 at 44–45). Finally, while reviewing personnel files, Oakes noted that several employees did not have drivers' license copies or I–9 forms on file. (Doc. 25–1 at 44).

It is undisputed that Oakes never contacted Hodge to inquire as to the propriety of Plaintiff's practices before Oakes terminated Plaintiff. Instead, Defendant argues that after he discovered these issues he called Rodney Carmical, the State's chief administrator over road superintendents, to discuss whether or not he could fire Plaintiff. Defendant claims that he spoke with Carmical on September 1, 2014 and that Carmical stated that Oakes could legally fire Plaintiff for "trust issues." (Doc. 25–1 at 43–44). Plaintiff, however, has introduced evidence that Oakes did not

speak with Carmical until September 3, 2014. (Doc. 27–10 at 34).

This difference is significant, because Plaintiff was officially terminated on September 2, 2014. Plaintiff claims that on that day he reported for work at his normal time, and was immediately called into Oakes' office. Plaintiff described the morning's events as follows:

> [Oakes] come into work on Tuesday, you know, and came in and he talked to everyone and asked me into the office and asked me to shut the door behind me and said we had something to discuss. And he told me I was—he was going to have to let me go, that he was terminating me, and I asked him why. He said trust issues. And I kept, you know, can you give me a reason why, you know, why? And he told me, you know the reason why. And I said, no, I don't. I'm asking you why you're terminating me, and he just kept saying trust issues. And then he told me I just needed to go down to the office and get my separation slip and leave.

(Doc. 27–7 at 55–56). Plaintiff then went to Mooneyham to collect his separation slip, and left the office.

Plaintiff filed the instant Complaint on August 25, 2015 against Van Buren County, Tennessee, the Van Buren County Highway Department, and Superintendent Oakes, in his official capacity.[7] Therein, he alleges that he was terminated in retaliation for supporting Walling in the general election, in violation of the First Amendment to the United States Constitution via 42 U.S.C. § 1983. (Doc. 1 at 5). Defendants

---

**7.** Plaintiff's Complaint does not specify whether he is suing Defendant Oakes in his individual or official capacity. Absent a clear indication that Oakes is being sued individually, however, the Court construes Plaintiff's claim as against Defendant Oakes in his official capacity. *See, e.g., Shepherd v. Wellman,*

313 F.3d 963, 967 (6th Cir. 2002) ("As a result, we require § 1983 plaintiffs to set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply their capacity as state officials.") (internal quotation marks and citations omitted).

filed their Motion for Summary Judgment (Doc. 25) on October 3, 2016, claiming that certain Defendants should be dismissed as improper parties, and that the remaining Defendant is entitled to judgment as a matter of law. This matter has been fully briefed and is now ripe for review.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); see also *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

## III. ANALYSIS

### A. Defendants Van Buren County Highway Department and Superintendent Randy D. Oakes

■ At the outset, Defendants claim that the Van Buren County Highway Department and Superintendent Randy D. Oakes, in his official capacity, are not proper parties to this lawsuit. Van Buren County Highway Department, Defendants argue, is an administrative agency of Van

Buren County, and is thus not a "person" amenable to suit under 42 U.S.C. § 1983. *See, e.g., Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Defendants then note that Plaintiff has sued Defendant Oakes in his official capacity and not in his individual capacity. An official capacity suit, however, "is the equivalent of a suit against the governmental entity." *Id.* The claim against Defendant Oakes in his official capacity is therefore superfluous.

Plaintiff does not contest these arguments. (Doc. 27 at 13 n.10) ("In light of the information revealed during the discovery process in this case, Plaintiff does not dispute Defendants' position that Randy Oakes (in his individual capacity) and the Van Buren County Highway Department should be dismissed as defendants to this action, as set forth in Sections III(A) and III(B) of Defendants' Brief. *This would leave Van Buren County as the proper defendant to this litigation*.") (emphasis added). Because Plaintiff has expressly abandoned his claim against Defendant Van Buren County Highway Department and Defendant Superintendent Randy Oakes, Defendants' Motion for Summary Judgment will be **GRANTED** as to those parties.

### B. Municipal Liability

■ It is well-established that municipalities and other local governing bodies may be sued under 42 U.S.C. § 1983. *See generally Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To establish municipal liability under § 1983, "the plaintiff must establish that: (1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). A plaintiff must point to some policy or custom of the municipal defendant causing the complained-of constitutional violation in order to demonstrate that a municipality is liable for the

violation. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. This "official policy" requirement is intended to ensure that a municipality is held liable only for its own acts rather than the acts of its employees—a municipality cannot be held responsible under a theory of *respondeat superior. See id.*; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *see also Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (noting that a plaintiff seeking municipality liability under § 1983 "must ... demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (emphasis in original).

■ Van Buren County, Tennessee, the only remaining Defendant in the case (hereinafter "the County," or "Defendant") first argues that Plaintiff has not shown the existence of a county custom or policy that caused a deprivation of his constitutional rights. (Doc. 26 at 12). A plaintiff can show that a municipality's custom or policy is unconstitutional by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

■ In certain circumstances, a single policymaker's or decisionmaker's actions can subject the County to municipal liability. *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292. In such a situation, "[m]unicipal lia-

bility attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered ... Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Id.* at 481–83, 106 S.Ct. 1292. A decisionmaker may also be found to possess final authority by virtue of "less formal sources of law such as local practice and custom." *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir. 1993). To determine whether a decisionmaker possesses such authority, the Court must look to state law. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 · (1989) ("As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law, the trial judge must identify those officials or government bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.") (emphasis in original) (internal quotation marks and citations omitted).

█ Notwithstanding Defendant's protestation to the contrary, Plaintiff has established that Superintendent Oakes possesses final decision making authority such that his actions can subject the County to municipal liability. Pursuant to state law, the County Road Superintendent is the "chief administrative officer" of the County Highway Department. Tenn. Code Ann. § 54–7–103. As such an officer, Superintendent Oakes "is authorized to determine the total number of employees of the highway department, *to determine personnel policies,* hours of work, to establish job classifications, and to establish policies and wages within the classifications." Tenn. Code Ann. § 54–7–109(c) (emphasis added). Plaintiff has thus established that positive state law vests in Superintendent Oakes the authority to set personnel policies, and nothing in the record suggests that this authority is subject to review. *See Feliciano,* 988 F.2d at 655 ("Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker *unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials.*") (emphasis added). In fact, it establishes just the opposite, *i.e.* that Superintendent Oakes' authority is unchecked with regards to hiring and firing decisions. The record also establishes that it has been the longstanding local custom that the Road Superintendent has ultimate authority to establish personnel policies and to hire and fire employees. (Doc. 27–9 at 16; 77–79); (Doc. 27–11 at 11–12).

█ Defendant has not responded substantively to these positive sources of state law or local customs, but rather argues in a conclusory fashion that Superintendent Oakes was merely exercising "decision making ability within the department," and accordingly was "not [setting] county policy." (Doc. 28 at 2). As established above, however, Plaintiff has presented both positive state law and local custom [8] establish-

---

8. Defendant's argument that there is no "custom" to establish municipal liability is misplaced. Defendant accurately notes that a plaintiff may establish a "custom" in support of municipal liability by showing that policymaking officials had knowledge of unconstitutional conduct and that they acquiesced to such conduct. (Doc. 28 at 2–3) (citing *Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL–CIO v. City of Memphis,* 361 F.3d 898, 902 (6th Cir. 2004)). This, however,

ing that Superintendent Oakes' authority to set personnel policies and to hire and fire employees was unreviewable. Defendant's argument that "Plaintiff has not established ... that Defendant Oakes had been delegated final authority to implement policy for the county as opposed to simply making decisions for his department," (*id.* at 3), is thus misguided at best and disingenuous at worst. Accordingly, the Court finds that Superintendent Oakes is a final policymaker such that his actions can subject Defendant Van Buren County to municipal liability. *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292.

## C. Retaliatory Discharge

 Plaintiff's First Amendment retaliatory discharge claim is governed by a burden-shifting framework. First, Plaintiff must prove his *prima facie* case by demonstrating that

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary fitness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). If Plaintiff shows each of these elements, the burden shifts to Defendant to prove by a preponderance of the evidence that that the same adverse action would have been taken absent the protected conduct. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). After Plaintiff meets his initial burden, summary judgment is only appropriate where "in light of

the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Garvey v. Montgomery*, 128 Fed. Appx. 453, 459 (6th Cir. 2005) ("Summary judgment would have been warranted, in other words, only if defendants' evidentiary proffer compelled the finding that political discrimination did not constitute a 'but for' cause of the demotion.")). Importantly, and unlike in the *McDonnell Douglas* burden-shifting framework applicable in Title VII actions, once Plaintiff establishes a *prima facie* case, "the burden does not shift back to [the] plaintiff to show pretext in First Amendment retaliation claims." *Dye*, 702 F.3d at 295.

### 1. *Plaintiff's* Prima Facie *Case*

Defendant concedes, and the Court agrees, that Plaintiff has established the first two prongs of his *prima facie* case. (Doc. 26 at 18–19). As for the third prong, Defendant argues that Plaintiff cannot prove a causal connection between his protected conduct and the adverse employment action for two reasons: (1) Plaintiff has failed to show that Superintendent Oakes actually knew that Plaintiff supported Walling; and (2) Plaintiff "cannot show that his discharge was in fact substantially motivated by his support of Mr. Walling." (*Id.* at 19). Each argument will be discussed in turn.

While Superintendent Oakes' knowledge of Plaintiff's protected activity is not technically an element of Plaintiff's *prima facie* case, such knowledge is an implicit prerequisite for Plaintiff to show a causal connection between the protected activity and the adverse employment action. *See, e.g., Hall*

---

is only one of many ways to prove that a municipality is liable for a constitutional violation. Plaintiff is not proceeding under this theory, but rather under the theory that Superintendent Oakes is a final decisionmaker

whose actions can subject Defendant Van Buren County to municipal liability. Defendant's "knowledge and acquiescence" argument, therefore, is wholly unresponsive to Plaintiff's allegations.

*v. Tollett*, 128 F.3d 418, 426–27 (6th Cir. 1997). Defendant argues that Plaintiff has not set forth sufficient evidence to show that Superintendent Oakes knew that Plaintiff supported Walling in the general election. (Doc. 26 at 20–21). The Court disagrees. It is uncontested that Superintendent Oakes saw Plaintiff standing with Bruce Dunn on the side of a county highway while Dunn put up a sign supporting Walling. (Doc. 27–9 at 11–14). Defendant argues that because it was Dunn and not Plaintiff that put the sign in the ground, Superintendent Oakes could not have known that Plaintiff actually supported Walling. (Doc. 26 at 21). This argument, however, ignores the relevant standard of review. In analyzing motions for summary judgment, courts must "view the evidence *and draw all reasonable inferences* in favor of the nonmoving party." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (emphasis added). The Court finds it eminently reasonable to infer that Superintendent Oakes knew that Plaintiff supported Walling based on the above-described scene. Indeed, it may be unreasonable not to draw such an inference.[9] This, of course, is a question for a jury to decide.

■ Next, Defendant argues in a conclusory fashion that Plaintiff "cannot offer any significant and probative evidence of a causal connection between his discharge and his support of Mr. Walling."[10] (Doc. 26 at 22). Again, the Court disagrees. It is well-established that a plaintiff can demonstrate such a causal connection with either direct or circumstantial evidence. *Eckerman*, 636 F.3d at 209 ("A causal link can be shown through direct or circumstantial evidence, *including showing temporal proximity between engaging in a protected activity and suffering an adverse employment action that may create an inference of causation*.") (emphasis added). Here, Plaintiff has offered admissible evidence that Superintendent Oakes began engaging in retaliatory conduct at 12:15 a.m. on September 1, 2014, a mere *fifteen minutes* after he officially became the County Road Superintendent. Plaintiff was then terminated within the first business hour of his employment under the Oakes administration. The Court finds that the timing of Plaintiff's termination alone is enough to create an inference of causation.

In addition to the suspicious timing of his termination, Plaintiff has offered other evidence showing a causal link between his protected activity and his termination. First, it is uncontested that Sharon Mooneyham was offered Plaintiff's position *before* Superintendent Oakes

9. Defendant has not produced any evidence that Superintendent Oakes even contemplated that Plaintiff had a non-partisan reason to accompany Dunn on his mission to place yard signs in support of Walling. While one such reason may have existed, it is sufficient at this stage for the Court to find it reasonable to infer that Plaintiff's presence with Dunn put Superintendent Oakes on notice that Plaintiff supported Walling.

10. Defendant's argument regarding Plaintiff's Charge of Discrimination with the Equal Employment Opportunity Commission is unavailing. (*See* Doc. 26 at 22). Defendant argues that "Plaintiff clearly and exclusively stated under oath that he was discharged because of his sex and age." (*Id.*). Plaintiff, however, is not required to raise his First Amendment retaliatory discharge claim with any administrative agency before filing a federal lawsuit. *See, e.g., Hochman v. Bd. of Educ. of the City of Newark*, 534 F.2d 1094, 1097 (3d Cir. 1976) ("When appropriate federal jurisdiction is invoked alleging violation of First Amendment rights, as Hochman does here, we may not insist that he first seek his remedies elsewhere no matter how adequate those remedies may be."). Furthermore, nowhere on Plaintiff's EEOC Charge of Discrimination does he state that sex and age were the exclusive reasons for his termination. (*See* Doc. 25–1 at 6). Accordingly, Defendant's argument is nothing more than a red herring.

even took office. This, of course, happened before Superintendent Oakes had any reason to suspect that Plaintiff was not performing his job adequately. Second, Plaintiff has alleged, and Defendant has not denied, that several other employees who supported Walling suffered adverse treatment at the beginning of Oakes' administration. Specifically, Plaintiff claims that on the first day Superintendent Oakes took office, he suspended for one week without pay all employees he knew to have supported Walling.[11] When those employees returned to work the following week, they found that their pay had been cut, while certain employees who supported Superintendent Oakes had gotten raises.[12] (Doc. 27 at 8–9); (Doc. 27–6).

The Court finds that, taken as a whole, Plaintiff has produced enough evidence to persuade a reasonable jury to find that his termination was substantially motivated by his support for Walling in the general election. Accordingly, Plaintiff has established his *prima facie* case. *See Sowards v. Loudon County, Tennessee*, 203 F.3d 426, 435 (6th Cir. 2000) ("Viewing the evidence in the light most favorable to [plaintiff], we conclude that a genuine issue of material fact exists whether [plaintiff's] termination was substantially motivated by her protected associational freedoms. Therefore, the district court erred in granting defendants' motion for summary judgment.").

### 2. Burden Shift

Because Plaintiff has established his *prima facie* case, the burden now shifts to Defendant to show by a preponderance of the evidence that Plaintiff would have been terminated absent his protected conduct. *Dye*, 702 F.3d at 294. Defendant maintains that, politics aside, Plaintiff was terminated for "trust issues" stemming from two incidents that occurred before Superintendent Oakes was elected, as well as the discovery of several suspicious documents. (Doc. 26 at 23–24). These incidents will be briefly discussed in turn.

First, Defendant argues that before Superintendent Oakes took office, Plaintiff improperly disclosed confidential personal information from Superintendent Oakes' personnel file to an unknown person. This in turn led Superintendent Oakes to purchase LifeLock, an identity theft protection service. (Doc. 27–12 at 12). Plaintiff, however, testified in his deposition that he was approached at the office by at TBI agent who was investigating Superintendent Oakes' qualifications to run for office. According to Plaintiff, he only showed the TBI agent the front cover of Superintendent Oakes' personnel file, which stated his name, date of hire, job title, and pay. (Doc. 25–1 at 72). Second, Superintendent Oakes testified that Kenny Smith told him just days before he took office that Plaintiff had removed a reprimand from Kenny Smith's personnel file.[13] (Doc. 27–9 at 63–

**11.** Superintendent Oakes testified that he did not need the Highway Department's full staff to help clean up the office, and that he only needed equipment operators. At least one of the employees that supported Walling and was suspended, however, was an equipment operator. (Doc. 27–9 at 11, 69–72).

**12.** Defendant's argument that Oakes "knew other Highway Department employees had actively supported Mr. Walling ... [and] not one of these other employees ... was discharged," is misguided. (Doc. 26 at 22). First, it is elementary that termination is not the

only type of adverse employment action. Second, and more importantly, Superintendent Oakes' alleged mistreatment of other Walling supporters (and preferential treatment of Oakes supporters) is without a doubt relevant circumstantial evidence supporting Plaintiff's claim that his termination was politically motivated.

**13.** It is worth noting that Defendant is offering Kenny Smith's declaration for the proposition that Plaintiff removed a reprimand from his personnel file. Because Kenny Smith was not deposed, and Defendant only offers

65). Plaintiff testified that he has never removed anything from anyone's personnel file. (Doc. 25–1 at 81).

Finally, Defendant argues that on September 1, 2014, Superintendent Oakes' first day in the office, he discovered several documents that led him to believe that Plaintiff was falsifying records and was performing his job in an unsatisfactory manner. These documents included: (1) a fully completed time sheet for the first two weeks of September of 2014; (2) documents indicating that Plaintiff had been paid overtime even though he was a salaried employee; (3) documents indicating that Plaintiff had approved payment of sick leave payouts at improper times (i.e. in August, rather than in June or December); and (4) employees' personnel files did not contain I–9 forms and other required documents. (Doc. 26 at 23–24). Superintendent Oakes found these documents to be troubling, and determined, without further investigation, that they justified Plaintiff's dismissal.

In addition to flatly contradicting Superintendent Oakes' allegations regarding the TBI agent and Kenny Smith's personnel file, Plaintiff has introduced considerable evidence that Superintendent Oakes' "trust issues" justification was merely pretext.[14] Most alarmingly, Superintendent Oakes admitted in his deposition that he did not conduct any investigation whatsoever into the documents outlined above to confirm

that Plaintiff was actually engaging in nefarious conduct. (Doc. 27–9 at 61, 65); (see also Doc. 27–8 at 7–8). Furthermore, former County Road Superintendent Hodge testified that it was standard practice at the Highway Department to fill out time sheets ahead of time, for salaried employees to receive overtime pay, and for employees to be paid for their sick leave at any time (not just in June or December).[15] (Doc. 27–8 at 5–7). Superintendent Oakes testified at his deposition that had he known that this was standard practice, it would have changed his opinion as to whether Plaintiff had engaged in misconduct. (Doc. 27–9 at 61–63). Finally, Superintendent Oakes testified that he had spoken with Rodney Carmical, the State's chief administrator over road superintendents, before terminating Plaintiff to ensure that he had legal cause to do so. (Id. at 45). Plaintiff, however, has introduced an entry from Sharon Mooneyham's personal notes stating that Superintendent Oakes did not speak with Carmical about Plaintiff until September 3, 2014, a full day after Plaintiff was terminated. (Doc. 27–10 at 34) ("Wed. 09/03/14 ... Rodney Carmical called Randy back. When Randy explained about what he had found and the actions he took of firing Duane, Rodney told Randy that was falsifying documents and his termination was justified.").

In short, Plaintiff has introduced evidence that his replacement was hired be-

---

Superintendent Oakes' recounting of the declaration, this evidence appears to be inadmissible hearsay that cannot be considered at the summary judgment stage. See, e.g., Alpert v. United States, 481 F.3d 404, 409 (6th Cir. 2007). The Court need not rule on this issue, however, because it has not been briefed and does not alter the disposition of Defendant's motion.

**14.** The Court is mindful that in First Amendment retaliatory discharge claims, the burden does *not* shift back to Plaintiff to show that Defendant's proffered reason for discharge is

pretext for unlawful retaliation. Dye, 702 F.3d at 295. Plaintiff's evidence of pretext, however, is a relevant consideration in analyzing whether Defendant has met its burden to show by a preponderance of the evidence that Plaintiff would have been discharged for reasons unrelated to Plaintiff's protected conduct.

**15.** When asked about the I–9 forms, Hodge testified that he did not know whether they were required to be maintained in employees' personnel files. (Doc. 25–1 at 103).

fore Superintendent Oakes took office and that Superintendent Oakes failed to conduct a reasonable investigation—indeed, any investigation at all—into the documents he found on September 1, 2014. The Court finds that, viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could find that Superintendent Oakes did not fire Plaintiff for "trust issues," but rather because he supported Walling in the general election. Accordingly, the Court cannot grant Defendant's motion for summary judgment under the above-analyzed burden-shifting framework.

### 3. Exceptions to the Prohibition of Patronage Dismissals

 This finding, however, does not end the Court's inquiry.[16] The County next argues that "even if Plaintiff could establish a relationship between his support of Mr. Walling and his discharge, he could not prevail because the position he held was one for which a patronage dismissal would not violate his First Amendment rights." (Doc. 26 at 13). The term "patronage dismissal" refers to a situation in which an employee is terminated for his/her failure to support a particular political party or candidate, or, in this case, for affirmatively supporting an unsuccessful candidate. See Summe v. Kenton Cnty. Clerk's Office, 604 F.3d 257, 264 (6th Cir. 2010).

 As a general matter, the First Amendment to the United States Constitution proscribes patronage dismissals. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct.

2673, 49 L.Ed.2d 547 (1976) (plurality opinion). As with most rules, however, there are exceptions. Specifically, the Supreme Court of the United States has recognized that "party affiliation may be an acceptable requirement for some types of government employment. Thus, if an employee's private political beliefs would interfere with the discharge of his duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." Branti v. Finkel, 445 U.S. 507, 517, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Supreme Court initially defined such types of positions as those involving "confidential" or "policymaking" functions. Id. After twenty years of case law development, the United States Court of Appeals for the Sixth Circuit distilled four categories of positions to which the First Amendment's prohibition of patronage dismissals does not apply. Those categories include:

**Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

**Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held

---

**16.** In analyzing First Amendment retaliatory discharge claims, the Court must address Plaintiff's *prima facie* case before deciding whether Plaintiff's position is protected from patronage dismissals. *Lane v. City of LaFollette*, 490 F.3d 410, 419 (6th Cir. 2007) ("The first step in analyzing a claim of patronage dismissal requires asking whether the party asserting that he was wrongfully terminated has produced sufficient evidence for a jury to find that he was discharged because of his political beliefs or affiliations. If the terminated party makes this showing, then the burden shifts to the employer to demonstrate that the terminated party's job was one for which political affiliation was an appropriate requirement.") (citations omitted).

by category one positions in other jurisdictions;

**Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors; [and]

**Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*McCloud v. Testa,* 97 F.3d 1536, 1557 (6th Cir. 1996) (footnotes omitted). Whether a government position falls into one of these categories is a question of law, *Lane,* 490 F.3d at 418, and such a determination must be made on a case-by-case basis with reference to "the responsibilities and duties of each position." *Hall,* 128 F.3d at 427. A position "need not fall neatly within one of the categories to be entitled to the exception," and "should the position fit into one of the categories *with reasonable certainty,* then political affiliation is an appropriate requirement and a public employee may be adversely affected without violating her constitutional rights." *Hager v. Pike Cnty. Bd. of Educ.,* 286 F.3d 366, 374 (6th Cir. 2002) (emphasis in original) (internal quotation marks and citations omitted).

◼ Defendant Van Buren County argues that Plaintiff is not entitled to protection from a patronage dismissal because his position as Secretary/Accountant/Bookkeeper falls under Categories Two and Three above.[17] (Doc. 26 at 13–18). In the interest of brevity, the Court will proceed immediately to Category Three. As articulated, *supra,* one is not protected from a patronage dismissal if he is a "confidential employee[ ] who control[s] the lines of communications to category one positions." *McCloud,* 97 F.3d at 1557. In this case, it cannot be seriously contested that County Road Superintendent qualifies as a Category One position. After all, the County Road Superintendent is defined *statutorily* as the "chief administrative officer" of the County Highway Department, Tenn. Code Ann. § 54–7–103, and is explicitly given "general control" over the "repair and maintenance of the county road systems." Tenn. Code. Ann. § 54–7–109(a). It similarly cannot be contested that Plaintiff was a "confidential employee" as his position gave him access to confidential personal information of employees such as social security numbers and to politically sensitive information such as the Highway Department's budget and purchase orders. (Doc. 25–1 at 60, 63).

The only remaining question, therefore, is whether the Secretary/Accountant/Bookkeeper "controls the lines of communications" to the County Road Superintendent. Defendant's characterization of the position aside,[18] Plaintiff, by his own admission, establishes that the Secretary/Ac-

---

**17.** While Defendant does not explicitly state that Plaintiff's position fits within both Category Two and Category Three, the cases to which Defendant compares the present situation analyze both categories of positions. (Doc. 26 at 17) ("The Court considered the nature of her duties and responsibilities and determined that she occupied a category two and/or three position and therefore her alleged patronage dismissal fell within the El-rod–Branti exception entitling the employer to summary judgment.") (emphasis in original).

**18.** At this stage in the proceedings, the Court, as it must, views the facts in a light most favorable to Plaintiff. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

countant/Bookkeeper does, in fact, "control the lines of communications" to the County Road Superintendent. First, and most strikingly, the unique circumstances created by former County Road Superintendent Hodge's leave of absence clearly establish that the Secretary/Accountant/Bookkeeper plays such a role in the Van Buren County Highway Department. Specifically, in his deposition, Plaintiff admits that he was in contact with Hodge every day. (Doc. 27–7 at 17). Plaintiff described these conversations as follows: "I mean, you know, people would come to me and ask me questions of what needed to be done and then I would have to get with Danny [Hodge] on it and get back with them ... I would go to him every time [somebody had a question.]" (*Id.* at 18). Moreover, Hodge stated in his deposition that

> [q]uite frequently [Plaintiff] would come to the hospital. Even when I was in Nashville, he would make—made several trips to Nashville to—well, to get me to sign papers and to ask my—what I wanted him to do on certain matters. To get payroll signed, he made quite a few trips to the hospital and to my home during the course of the job.

(Doc. 27–8 at 4–5). On this record, therefore, it is clear that the Secretary/Accountant/Bookkeeper quite literally controlled the lines of communications to the County Road Superintendent.

Even putting aside these unique circumstances, Plaintiff's job duties before Hodge's leave of absence dictate the same result. As previously established, the Secretary/Accountant/Bookkeeper has unfettered access to the Highway Department's budget and purchase orders. (Doc. 25–1 at 59, 62). Plaintiff also testified that he worked closely with the County Trustee to keep track of state and federal funds. (*Id.* at 78) ("I worked close with her every day on the money, you know, receiving and everything when the state—we received state money she would—we would have to balance with her every day, every week, every month."). With this information, Plaintiff prepared monthly reports for the County Road Superintendent that were subsequently sent to the state. (*Id.* at 63). While it was the County Road Superintendent that signed these reports, Plaintiff could not recall a single instance in which Hodge made changes to Plaintiff's reports before signing them. (*Id.*). Moreover, the Secretary/Accountant/Bookkeeper was responsible for providing information to state employees during twice-yearly audits. (*Id.*). During these audits, Plaintiff used his computer to access invoices and purchase orders, and answered occasional questions regarding other budgetary matters. Plaintiff testified that these audits would typically take "a couple of days" and that Hodge was not always present. (*Id.*). Given this information, the Court finds that the Secretary/Accountant/Bookkeeper in the Van Buren County Highway Department controls the lines of communications between the Road Superintendent, the County Treasurer, and the State on a matter of political concern, i.e. the Department's budget.[19] *See, e.g., Blair v. Meade,* 76 F.3d 97, 100 (6th Cir. 1996) ("Money consistently plays a very important role in politics. As a result, budgetary decisions are among the most significant, and the most political, actions which government officials take.").

Finally, in determining whether Plaintiff's position falls within one of the *McCloud* categories, the Court is also to

---

**19.** It is also worth noting that Hodge agreed that during his administration as County Road Superintendent, Plaintiff was his "right hand man." (Doc. 25–1 at 100–01). This bolsters the Court's finding that Plaintiff's position falls within the exception to the First Amendment's prohibition on patronage dismissals.

consider the position as envisioned by the newly elected official, i.e. Superintendent Oakes. *Faughender v. City of North Olmsted, Ohio*, 927 F.2d 909, 913 (6th Cir. 1991) ("To determine whether political considerations are appropriate in making personnel decisions for a certain position, we must examine the inherent duties of that position *and* the duties that the new holder of that position will perform.") (emphasis in original). It is uncontested that Superintendent Oakes is not computer savvy. (Doc. 27–9 at 38). It stands to reason, therefore, that he will require more assistance with regards to accessing budgetary information on computers than did his predecessor. Accordingly, the Court finds that the Secretary/Accountant/Bookkeeper will exercise even more control over the lines of communications regarding budgetary matters in Oakes' administration than in Hodge's administration.

Notwithstanding Plaintiff's proclamation that his duties were purely ministerial in nature, the Court finds that Plaintiff's position as described above falls, with reasonable certainty, within *McCloud*'s third category of positions for which a patronage dismissal does not run afoul of the First Amendment. *Sowards*, 203 F.3d at 437 ("The *McCloud* category three position involves employees who control the lines of communication to category one or category two position-holders. This category is concerned with this type of employee's access to confidential, political information transmitted to the policymaker, which requires political loyalty.") (citations omitted). Indeed, courts have not been hesitant to dismiss similar claims made by seemingly administrative employees. *See, e.g., Blair*, 76 F.3d at 101 (finding that the assistant/bookkeeper to a Chief Financial Officer is not protected from a patronage dismissal); *Rice v. Ohio Dept. of Transp.*, 14 F.3d 1133, 1141–43 (6th Cir. 1994) (finding that administrative assistants to the Ohio Director of Transportation are not protect-ed from patronage dismissals, even though they did not work closely with the Director); *Faughender*, 927 F.2d at 913–14 (finding that a mayor's secretary is not protected from a patronage dismissal).

Because Plaintiff's position falls within an exception to the First Amendment's prohibition of patronage dismissals, no constitutional violation has occurred and Plaintiff is not entitled to recovery. *Spears*, 589 F.3d at 256 ("To establish municipal liability under Section 1983, the plaintiff must establish that . . . the plaintiff's harm was caused by a constitutional violation."). Accordingly, Defendant's Motion for Summary Judgment must be **GRANTED**.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. 25) is hereby **GRANTED** and Plaintiff's claim will be **DISMISSED WITH PREJUDICE**. A separate judgment will enter.

**SO ORDERED** this day of January 4, 2017.

